Tiffany THOMAS, et al., Plaintiff(s),

v.

## CLAYTON COUNTY BOARD OF EDUCATION, et al., Defendant(s).

### No. Civ.A.1:97CV1517A–JEC.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 29, 1999.

---

Torin Dana Togut, Office of Torin D. Togut, Roswell, GA, Michael Raymond Hauptman, Office of Michael R. Hauptman, Atlanta, GA, Gerald R. Weber, Robert Lo–Pei Tsai, American Civil Liberties Union of Ga. for plaintiffs.

J. Stanley Hawkins, Gary M. Sams, Laura Louise Lones, Weekes & Candler, De-

catur, GA, for Ralph Matthews, Clayton County School Dist., defendants.

Robert Earl Wilson, Ellen S. Cheek, Wilson Morton & Downs, Decatur, GA, for R.G. Roberts, defendant.

Roger S. Sumrall, Hall Booth Smith & Slover, Atlanta, GA, Arnold Wright, Jr., Freeman Wright & Herman, Atlanta, GA, for Tracey Morgan, defendant.

Jack Reynolds Hancock, Brian R. Dempsey, Hancock & Echols, Forest Park, GA, for Zannie Billingslea, defendant.

Donald Ray Foster, Foster & Foster, Jonesboro, GA, John Alvin Kimbell, Fincher & Hecht, Morrow, GA, for Clayton County, GA, defendant.

Gerald R. Weber, Robert Lo–Pei Tsai, American Civil Liberties Union of Ga., Atlanta, GA, for Sergio Evans, Josh Starks.

### ORDER

CARNES, District Judge.

This case is presently before the Court on defendant Tracey Morgan's Motion for Summary Judgment [61], defendant R.G. Roberts' Motion for Summary Judgment [62], defendant Ralph Matthews' Motion for Summary Judgment [64], defendant Clayton County School District's Motion for Summary Judgment [65], defendant Zannie Billingslea's Motion for Summary Judgment [68], defendant Clayton County's Motion for Summary Judgment [72], and defendant Tracey Morgan's Motion to Seal a Page of her Motion for Summary Judgment [84–A]. The Court has reviewed the record and the arguments of the parties and, for the reasons set forth below, concludes that defendant Tracey Morgan's Motion for Summary Judgment [61] should be **GRANTED,** defendant R.G. Roberts' Motion for Summary Judgment [62] should be **GRANTED,** defendant Ralph Matthews' Motion for Summary Judgment [64] should be **GRANTED,** defendant Clayton County School District's Motion for Summary Judgment [65] should be **GRANTED,** defendant Zannie Billingslea's Motion for Summary Judgment [68] should be **GRANTED,** defendant Clayton County's Motion for Summary Judgment [72] should be **GRANTED,** and defendant Tracey Morgan's Motion to Seal a Page of her Motion for Summary Judgment [84–A] should be **DENIED.**[1]

### BACKGROUND

I. *The events of October 31, 1996*

On the morning of October 31, 1996, plaintiff Sergio Evans brought an envelope containing $26.00 to his school, West Clayton Elementary School in Clayton County, Georgia. (Pls.' Resp. to Defs. Clayton County School District & Matthews' Stmt. of Mat. Facts [81] at ¶ 1.) Sergio collected this money by selling candy to raise funds to enable the fifth grade to take a field trip to Tennessee. (*Id.* at ¶ 8.) Upon arriving at his classroom, Sergio placed the envelope on a table near the desk of his teacher, Tracey Morgan. (*Id.* at ¶ 9.) A few moments later, after Sergio and Ms. Morgan discovered that the envelope was no longer on the table, Sergio searched around the table and in his belongings in an attempt to locate the envelope. (Pls.' Resp. to Def. Roberts' Stmt. of Mat. Facts [83] at ¶ 4.) In addition, Morgan searched around the classroom for the envelope, taking the trash cans outside of the class to search through them. (*Id.* at ¶ 7.) Before Morgan

---

1. Defendant Morgan may file a new document, verbatim to the first pleading filed, except for the deletion of the name in question. The Court will then substitute this document for the current Motion for Summary Judgment filed by defendant Morgan. Filing matters under seal is cumbersome and should be avoided, if at all possible. Filing a single page of a document under seal would be highly confusing and render a reading of that document very difficult.

left the classroom, the Drug Resistance Awareness Education (hereinafter "DARE") officer, Zannie Billingslea, had arrived to teach the students a drug awareness lesson. (Morgan Dep. at 55–56.) Morgan left the room, leaving Billingslea with the children.

While outside the room, Morgan attempted to call Sergio's mother to ensure that Sergio had brought the money to school with him. (Pls.' Resp. [81] at ¶ 11.) Morgan then brought the trash cans with her to the school's workroom, where she encountered defendant R.A. Roberts, the assistant principal of the school, and Madricia Nettles, a school paraprofessional. (Pls.' Resp. to Def. Roberts' Stmt. of Mat. Facts [83] at ¶ 9.) Morgan explained to Roberts that money was missing from her classroom and asked if she could perform a search to find the money. (Id. at ¶ 10.) Roberts first asked if Morgan had collected all of the fund-raising and lunch monies she was supposed to collect that day. (Id. at ¶ 11.) What occurred next is disputed. Roberts asserts that she authorized a search, but gave Morgan specific limitations as to the extent of the search—authorizing only a search of the girls' purses and the boys' pockets but stopping short of authorizing a strip search of the children. (Roberts' Dep. at 59–60.) Morgan, on the other hand, testified that Roberts authorized a search but did not specify exactly how the search should be performed. (Morgan Dep. at 56, 60–62.) The parties also dispute whether Roberts gave Morgan permission to utilize Billingslea in any search of the children. (Id.; Roberts Dep. at 62.)

After speaking with Roberts, Morgan returned to her classroom and began to search for the missing envelope. (Pls.' Resp. [81] at ¶ 19.) First, as officer Billingslea watched from the back of the room, Morgan looked through the students' personal belongings, including the students' bookbags, desks, and decorative pumpkins on each desk. (Id. at ¶¶ 19–20.) Then, Morgan searched in the female students' purses and had each student remove his or her shoes, allowing her to pat down each student's socks. (Id. at ¶ 19.) Finally, Morgan asked the students to turn out their front pockets and allow her to pat down their back pockets. (Id.) This search did not result in the discovery of the lost envelope and did not suggest any one student as a particular suspect in the disappearance of the envelope. (Id. at ¶ 21.)

Morgan told Billingslea that the money had not been found and asked him to help her in a further search of the children. (Id. at ¶ 24.) At this time, Billingslea suggested to Morgan that some children might be wearing an extra set of pants and that the money might be located in a lower layer of clothing. (Def. Billingslea's Stmt. of Mat. Facts [68] at ¶ 7; Morgan Dep. at 73–74.) Morgan broke the male children up into groups of four and five and sent them group by group to the boys' bathroom with Billingslea. (Pls.' Resp. [81] at ¶ 25.)

At this point, the evidence is in dispute. Some of the boys testified that, once in the bathroom, Billingslea pulled down his pants and underwear to his ankles to demonstrate what the children were required to do.[2] (Brown Dep. at 20, 22, 26; Casey Dep. at 14, 65–67; Crawford Dep. at 13, 21; Willis Dep. at 14–15; Starks Dep. at 17, 47; CE Dep. at 29; DK Dep. at 14; FN Dep. at 10, 13, 23; IUQ Dep. at 11–12, 20; and ICU Dep. at 12, 20.) Plaintiffs also claim that Billingslea told the children that "if they did not pull down their pants and lift their shirts as he exhibited, then they would be suspended from school or

---

**2.** Billingslea denies that he pulled his pants and underwear down to his ankles and asserts that he only unfastened his pants and belt and

dropped his pants to his upper thigh. (Billingslea Dep. at 111–12.)

tedo jail.”[3] (Pls.’ Br. [82] at 4–5.) Consequently, the boys dropped their pants,[4] and some of the boys dropped both their pants and their underwear.[5] (Pls.’ Resp. [81] at ¶ 26.) The search resulted in no discovery of the missing envelope.

While searching the children in the bathroom, Lenard Grace, a student from another fifth grade class, entered the bathroom. (*Id.* at ¶ 28.) Lenard protested that he was not in Morgan’s class and should not be searched.[6] (Grace Dep. at 10–11.) Despite the protestations, Billingslea told Lenard to loosen his belt and turn out his pockets. (*Id.* at 11.) Lenard complied, and Billingslea grabbed Lenard by the pants, shaking them to see if anything would fall out. (*Id.*) Billingslea found no envelope on Lenard, and his “shake down” resulted in no evidence of wrongdoing. After completion of the searches, all of the boys returned to Morgan’s classroom, except for Lenard who returned to his fifth grade classroom.

After Billingslea completed his search of the boys, Morgan directed all of the girls in the class to line up in the hall outside the girls’ bathroom. (Pls.’ Br. [81] at 11.) Morgan took the girls in her class to the girls’ restroom in groups of approximately two to five students at a time. (Defs. Clayton County School District & Matthews’ Stmt. of Mat. Facts [65] at ¶ 32; Pls.’ Resp. to Defs. Clayton County School District & Matthews’ Stmt. of Mat. Facts [81] at ¶ 32.) While in the restroom, Morgan conducted a search of the children; however, the scope of the search is in dispute. Plaintiffs claim that the girls were forced to lower their pants and raise their dresses or shirts; the girls were also asked to “pop up” their bras to expose their breasts to ensure that the envelope was not stowed beneath their bras. (Pls.’ Resp. [81] at ¶¶ 33–34.) Some girls claimed that Morgan physically touched them as she actually searched their bras and dresses.[7] (Champion Dep. at 13–14; Australia Nettles Dep. at 11–12; Willingham Dep. at 11, 34; Tiffany Thomas Dep. at 32; Sales Dep. at 12–13; Def. Morgan’s Stmt. of Mat. Facts [61] at ¶ 8.) These searches did not turn up any money. (Defs.’ Stmt. of Mat. Facts [65] at ¶ 36.)

That afternoon, Tiffany Thomas’ father, Gregory Thomas went to the school after

3. Billingslea denies making such threats and asserts that the students “consented” to the search. (Billingslea Dep. at 116; Def. Billingslea’s Stmt. of Mat. Facts [68] at ¶¶ 20, 22.)

4. Plaintiff Jack Lowe testified in his deposition that he initially refused to drop his pants. Lowe testified that Billingslea threatened to “take him in” if he did not drop his pants. Accordingly, Lowe complied, dropping only his pants to the floor and lifting his shirt up so that Billingslea could look for the missing envelope. (Lowe Dep. at 16–20.) Lowe testified that two girls from Lowe’s neighborhood were standing at the open door to the restroom and saw Lowe drop his pants. (*Id.* at 28–29.)

5. Plaintiff Carl Casey claims he was forced to drop his pants and underwear to the floor for Officer Billingslea. (Carl Casey Dep. at 67–68.) Similarly, Derrick Crawford also dropped his pants and underwear to his knees. (Crawford Dep. at 13, 23–24.)

6. Billingslea denies that Lenard told him anything and asserts that he believed each student he searched was a member of Morgan’s fifth grade class. (Def. Billingslea’s Stmt. of Mat. Facts [68] at ¶ 23.)

7. Morgan, however, denies touching any child except for Cherika Sales. (Morgan Dep. at 98.) Cherika testified in her deposition that Morgan instructed her to go the bathroom and forced her to drop her pants, lift her shirt, and pop her bra, exposing her breasts. When her pants were down, Morgan patted down Cherika’s underwear to determine whether she had money in it. (Sales Dep. at 9, 12–15.) Morgan, however, disputes this testimony, claiming that although she did tug at Cherika’s bra, she did so to help Cherika fix the bra’s alignment and not to search for an envelope. Additionally, Morgan testified that she did not pat down Cherika’s underwear for an envelope. (Morgan Dep. at 97–99.)

his daughter informed him about the search and approached principal Ralph Matthews. (Pls.' Br. [81] at 14.) Mr. Thomas asked about a strip search that had occurred in the school. (Matthews Dep. at 50–51.) Matthews initially denied that a strip search had occurred because he assumed that he "would have been aware if something of that magnitude had occurred that particular school day." (*Id.* at 51–52.) After speaking to the parent, Matthews ran into Morgan who assured him that no strip search had occurred that day. (*Id.* at 54–55.) Morgan did inform Matthews that a search had occurred that included the searching of more than one student, and Morgan assured Matthews that she would call the parents of the children in her class that night to deal with the situation. (*Id.* at 55–56; Morgan Dep. at 115–17.)

## II. *The School's Investigation*

The next morning at 8:15 A.M., three sets of parents arrived at the school to meet with Roberts and Matthews concerning the searches. (Matthews Dep. at 59.) After a volatile discussion, Matthews assured the parents that the incident would be thoroughly investigated. (*Id.* at 60–61.) The three sets of parents checked their kids out of school and left the premises. (*Id.* at 64.) After discussing the matter among themselves, Roberts and Matthews determined that Roberts should gather the

students and have them write statements regarding what had occurred the day before. (Matthews Dep. at 64–65; Roberts Dep. at 85.) After reading the statements, Matthews and Roberts determined that Morgan needed to be brought into the office to give her statement. (Roberts Dep. at 98.) Morgan was at home sick that day, and Roberts called and asked her to come in to make the statement. (Morgan Dep. at 115.) Morgan came into the office and wrote down her description of the events of the previous day.[8] It is undisputed that Roberts and Morgan's recollection of the events leading up to the search of the children differed. (Morgan Dep. at 121; Roberts Dep. at 104–06; and Matthews Dep. at 106.)

Back at home, Morgan called Matthews to inform him that the second statement that she gave to Roberts was not accurate. (Morgan Dep. at 130.) Morgan explained that she felt that she was forced to change her statement and that she and Roberts disagreed as to the exact authorization given by Roberts to Morgan regarding the scope of the search that was conducted. (Matthews Dep. at 108–09.) Matthews allowed Morgan to write a third statement at home and submit it to him the following day. (*Id.* at 109.)

The Clayton County School District launched an investigation into the searches. One of the two Executive Directors of the School District, Dr. Ozias

---

8. Morgan and Roberts disagree about what occurred in Roberts' office. Morgan claims that she stayed in the office for four or five hours, as Roberts would not allow her to leave until she changed her statement. (Morgan Dep. at 127.) Roberts testified that the whole process took about an hour. (Roberts Dep. at 103–04.) According to Morgan, after she wrote her first statement, Roberts disagreed with Morgan's recollection of the events. In Morgan's first statement, Morgan wrote that Roberts had directed her to have the children take off their shoes and pull out their shirts in order to find the envelope. (Roberts Dep. at 101.) Morgan did not want to change her statement but testified that she was pressured by Roberts into changing the

statement to reflect Roberts' assertion that she only approved a search of the children's belongings and pockets. (Morgan Dep. at 120, 192–93.) Roberts states that she did ask Morgan to change her first statement but only because Morgan expressed uncertainty about the accuracy of her first statement; Roberts wanted to ensure that Morgan only wrote down what she was sure of and not speculation regarding the scope of the authority. (Roberts Dep. at 102–03.) In this vein, Roberts testified in her deposition that she told Morgan to indicate in her statement if she could not recall the details of what was said in the workroom. (*Id.* at 103.)

Pearson, became involved in the investigation and assigned Dr. Marty Whiteman, one of the two directors of personnel for the school district, to interview Roberts and Matthews regarding the searches and to accompany Dr. Bill Chavis to interview Morgan. (Whiteman Dep. at 21.) These officials did not interview any of the students involved, but simply relied on the students' statements written the day after the event. (*Id.* at 22.) Whiteman concluded, in his report to the school district, that the searches were not "anything out of the ordinary" and were not "strip searches." (*Id.* at 51; Pls.' School Exs. [84] at Ex. 9.)

### III. *The Police Department Investigation*

On November 1, 1996, the Clayton County Police Department (hereinafter "CCPD") first heard about the searches after a media representative called the CCPD Criminal Investigation Division. (Pls.' Resp. [82] at ¶¶ 31–32; Def. Clayton County's Stmt. of Mat. Facts [72] at ¶¶ 31–32.) Upon receipt of this call from the media, the matter was immediately referred to Clayton County Chief of Police Ronnie Clackum. (Pls.' Resp. [82] at ¶ 33; Def. Clayton County's Stmt. of Mat. Facts [72] at ¶ 33.) Clackum contacted Lieutenant Wally Woodcock to determine if a search had been performed. Contrary to

the usual practices of the CCPD, Billingslea had failed to complete an incident report about the searches and, when asked about the searches, Billingslea denied any participation in the searches. (Pls.' Resp. [82] at ¶¶ 35–37; Def. Clayton County's Stmt. of Mat. Facts [72] at ¶¶ 35–37.) That same day, Clackum met with Billingslea to discuss the incident and assigned Woodcock to investigate the matter. (Pls.' Resp. [82] at ¶¶ 38–39; Def. Clayton County's Stmt. of Mat. Facts [72] at ¶¶ 38–39.)

Woodcock's investigation consisted of interviews with Billingslea and numerous school officials and included a review of the students' written statements regarding the search. On January 13, 1997, Woodcock concluded his investigation,[9] and Clackum issued a Letter of Reprimand to Billingslea on February 14, 1997. (Pls.' Resp.[82] at ¶¶ 41, 45; Def. Clayton County's Stmt. of Mat. Facts [72] at ¶¶ 41, 45; and Pls.' Police Exs. [84] at Ex. 23 ("Letter of Reprimand").) In early March 1997, Billingslea received his 1996–97 annual evaluation, which contained a discussion of the incident. (Pls.' Resp. [82] at ¶ 46; Def. Clayton County's Stmt. of Mat. Facts [72] at ¶ 46.) At this evaluation, both Woodcock and Clackum recommended a pay increase of only 2.5%, two grades below what most officers received.[10] During this evaluation, Woodcock recommended that

---

9. Woodcock concluded that:

 OFFICER BILLINGSLEA acted without probable cause to search without conducting an investigation to discover facts that would focus on an individual suspect instead of searching to eliminate all students present as suspects.
 \*\*\*
 OFFICER BILLINGSLEA failed to obey known case law in dealing with searches of students in the school setting.
 OFFICER BILLINGSLEA violated the department's policies on searching and using police action in the school and did not contact any person in the supervision for advice.
 \*\*\*
 OFFICER BILLINGSLEA in the presence of minor children lowered his uniform

pants to attempt to gain the understanding of what he was trying to have the children do in the search of their underwear in the rest room. This is totally unprofessional. OFFICER BILLINGSLEA used threatening tactics to force students to pull their pants down during the search by telling them that he would take them to jail or juvenile if they (the students) did not comply.
(Pl.'s School Exs. [84] at Ex. 12 ("Woodcock's Investigative Summary").)

10. Indeed, only five of the 105 patrol officers evaluated that year received a 2.5% pay increase, while the remaining officers received a higher increase. This 2.5% raise was half of the 5% raise Billingslea had received the year before. (Pls.' ,Resp. [82] at ¶¶ 49–50; Def. Clayton County's Stmt. of Mat. Facts [72] at ¶¶ 49–50.)

Billingslea take additional training in specific areas addressing the law of search and seizure and students' rights. (Pls.' Resp. [82] at ¶¶ 48–53; Def. Clayton County's Stmt. of Mat. Facts [72] at ¶¶ 48–53.) Billingslea never took such training, however, as he was terminated from employment as a result of an untruthful interview given to the *Atlanta Journal–Constitution* regarding the reprimand he received from the department.[11] Billingslea was suspended on April 21, 1997 and fired on April 24, 1997. (Pls.' Resp. [82] at ¶¶ 54–60; Def. Clayton County's Stmt. of Mat. Facts [72] at ¶¶ 54–60.)

### IV. *Plaintiffs' Complaint*

Plaintiffs brought this lawsuit on May 27, 1997 and amended their complaint on December 1, 1998. In the amended complaint, plaintiffs alleged several causes of action. First, plaintiffs brought federal claims pursuant to 42 U.S.C. § 1983 alleging that defendants Morgan, Roberts, Matthews, Billingslea, Clayton County, and Clayton County School District "deprived the students of their right to privacy, to be secure in their persons and to be free from unreasonable searches and seizures as protected by the First, Fourth, Fifth, Ninth and Fourteenth Amendments of the United States Constitution."[12] (Amend.Compl. [53] at ¶ 102.) Further plaintiffs allege that "the actions of defendants deprived the students of their right to due process under the Fourteenth Amendment to the United States Constitution." (*Id.* at ¶ 103.) Second, plaintiffs brought state claims against all defendants alleging both state constitutional violations and statutory violations. Plaintiffs ask for both monetary and injunctive relief. (*Id.* at 23.) All six defendants have filed motions for summary judgment that are presently before the Court.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v. Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[13] designating " 'specific facts showing that there

---

**11.** In the article, Billingslea denied that he had been reprimanded for participating in the search. (Pls.' Resp. [82] at ¶ 54; Def. Clayton County's Stmt. of Mat. Facts [72] at ¶¶ 31–54.)

**12.** Plaintiffs concede that Clayton County is not responsible for violations of plaintiffs' First and Fifth Amendment rights. (Pls.' Br. [82] at 23 n. 7.)

**13.** The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. 2548 (quoting FED.R.CIV.P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

## II. *Plaintiffs' Federal Constitutional Claims*

Plaintiffs allege violations of several constitutional amendments including the First Amendment, Fourth Amendment, Fifth Amendment, Ninth Amendment, and Fourteenth Amendment and have sued under section 1983 to redress these violations. (Amend.Compl. at ¶ 102.) The individual defendants—Morgan, Roberts, Mathews, and Billingslea—argue that their actions do not amount to a constitutional violation under any of these amendments. Alternatively, the individual defendants argue that they are entitled to qualified immunity as to all constitutional claims.

As an initial matter, plaintiffs have offered no support for their claims that their First Amendment or Fifth Amendment rights have been violated. Indeed, plaintiffs have conceded that their First and Fifth Amendment claims against Clayton County and the individual defendants should be dismissed. (Pls.' Br. [82] at 23 n. 7; Pls.' Br. [83] at 5 n. 2.) Accordingly, all defendants are **GRANTED** summary judgment as to plaintiffs' First and Fourteenth Amendment claims.

As to plaintiffs' Ninth Amendment claim, plaintiffs make no attempt to flesh out the parameters of their Ninth Amendment claim. *See Bishop v. Aronov*, 926 F.2d 1066, 1078 n. 9 (11th Cir.1991). As plaintiffs admit, the students "raise their claims under the Fourth and Fourteenth Amendment." (Pls.' Br. [83] at 5 n. 2.) The Court concludes that plaintiffs' claims are adequately addressed under the Fourth and Fourteenth Amendments, and thus defendants' motions for summary judgment as to plaintiffs' Ninth Amendment claims are **GRANTED.**

Plaintiffs' remaining constitutional claims allege a violation of their Fourth Amendment rights. Additionally, plaintiffs allege a Fourteenth Amendment substantive due process claim. Defendants argue that, as plaintiffs' claims stem from the searches, plaintiffs' Fourteenth Amendment substantive due process claims must be dismissed. The Court agrees. *See Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

In *Graham*, the Supreme Court held:

[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

*Id.* at 396, 109 S.Ct. 1865 (emphasis in original); *see also Tinney v. Shores,* 77 F.3d 378, 381 (11th Cir.1996). Here, plaintiffs claim that they were unlawfully searched; it is axiomatic that unlawful search and seizure claim falls within the confines of the Fourth Amendment. *Graham,* 490 U.S. at 394, 109 S.Ct. 1865. Accordingly, the standards promulgated by the Fourth Amendment will govern this dispute.

A. *Unlawful Search and Seizure Claims Against Defendants Morgan, Roberts, Matthews, and Billingslea*

Initially, the individual defendants claim that their actions do not rise to the level of a constitutional violation and, accordingly, that they are entitled to summary judgment. Alternatively, the individual defendants contend that they are entitled to qualified immunity as to plaintiffs' Fourth Amendment claims.

1. *Existence of a Constitutional Violation*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and sei-

zures." U.S. CONST. amend. IV. "It is now beyond dispute that 'the Federal Constitution, by virtue of the Fourteenth Amendment, prohibits unreasonable searches and seizures by state officers.'" *New Jersey v. T.L.O.,* 469 U.S. 325, 334, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (quoting *Elkins v. United States,* 364 U.S. 206, 213, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960)).

■ In *T.L.O.,* the Supreme Court determined that the "strictures of the Fourth Amendment" apply to searches of students by school officials. *Id.* at 336–37, 105 S.Ct. 733. Nevertheless, the Court also made clear that the standards for determining the legality of a search of students would be more fluid than those applicable to a search of adults. Specifically, the Court determined that "the legality of a search of a student should depend simply on the reasonableness, under the circumstances, of the search." *Id.* at 341, 105 S.Ct. 733. In addition:

[d]etermining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the ... action was justified at its inception," [ ]; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place," [ ]. Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341–42, 105 S.Ct. 733 (citations and footnotes omitted). Accordingly, the rea-

sonableness of a search of a student by school officials necessarily involves a two-part inquiry: (1) whether the search was justified in its inception and (2) whether the search was reasonable in scope in light of the age and sex of the student and the intrusiveness of the search. Critically, in footnote, the Court noted that "[w]e do not decide whether individualized suspicion is an essential element of the reasonableness standard we adopt for searches by school authorities." [14] *Id.* at 342 n. 8, 105 S.Ct. 733.

As the Supreme Court in *T.L.O.* did not determine the propriety of strip searches in schools, this Court must look to circuit court case law for help in answering the questions presented in this litigation. The Eleventh Circuit has approved the strip search of a juvenile in a jail setting where the police had reasonable suspicion that the juvenile possessed contraband, but it has not directly addressed the standards that must be applied to strip searches in a school setting.[15] In *Justice v. City of Peachtree City*, 961 F.2d 188 (11th Cir. 1992), a fourteen-year-old female arrestee, was required to remove her outer garments, expose her breasts, and stand before female officers clad only in her panties. *Id.* at 191. While the juvenile was playing hooky from school at the time of the arrest, the search occurred in a jail, not a school, setting. Although noting the

obvious expectation of privacy in not having one's "private parts" exposed and recognizing that "a strip search represents a serious intrusion upon personal rights," *id.* at 192, the Eleventh Circuit upheld the strip search, which was based on reasonable suspicion that the detainee was concealing weapons or contraband, as being justified by legitimate institutional considerations. *Id.* at 193. Further, it concluded that the search was conducted in a minimally intrusive manner; that is, female guards searched the female detainee, the search was conducted in a private room, and the search did not extend to body cavities. *Id.*

Given the obvious factual dissimilarities, *Justice* is not terribly useful in deciding this case. It does establish that even juveniles may be subjected to a strip search if the juvenile has been arrested and if there is reasonable suspicion; it does not, however, set out the requisite level of suspicion in a school setting nor does it prescribe how particularized, within a group of individuals, the suspicion as to any particular individual must be to justify the search of that individual.

As noted, *supra*, at n. 15, the Eleventh Circuit has confronted the strip search of students in a case somewhat analogous to this case, but it did not issue a dispositive ruling as to the specific standards re-

14. Throughout their brief, plaintiffs contend that the Supreme Court in *T.L.O.* recognized a requirement that school officials must have individualized suspicion before searching a student in a public school, particularly with more intrusive searches. (Pls.' Br. [83] at 9.) To the contrary, the Supreme Court in *T.L.O.* made no such assertion and specifically did not decide the necessity of individualized suspicion in school search cases. *See T.L.O.*, 469 U.S. at 342 n. 8, 105 S.Ct. 733. Moreover, the Court did not even address the concept of "more intrusive searches" and the need for individualized suspicion in such a search.

15. The Eleventh Circuit, sitting en banc, had the opportunity to determine the proper standards for determining when a strip search of

a student in a public school violates the Constitution. *See* discussion *infra*. The court, however, stated that it did not reach the question whether the particular strip search was unlawful, because even if the latter was unconstitutional, the defendant school officials were entitled to qualified immunity. *See Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821, 824 n. 2 (11th Cir.1997) (en banc). Notwithstanding its disclaimer of any determination of the merits, however, the Court strongly signaled its deference to the judgment of school officials and its reluctance to dictate to school officials which rules violation warranted a strip search and which did not. *Id.* at 828. *See also* discussion *infra*.

quired. In *Jenkins v. Talladega City Board of Education,* 115 F.3d 821 (11th Cir.1997) (en banc), a second grade student informed her teacher that $7.00 was missing from the student's purse. Based on the accusation of another student, suspicion soon focused on three other students in the class; these three students were then twice subjected to strip searches—first by the teacher and then by the principal—in an effort to find the missing money. Although the en banc court disclaimed any determination of the constitutional merits of the strip searches, it nevertheless strongly signaled its understanding of the dilemma faced by a school officials in such a situation and its deference, as a general matter, to the judgment of school officials in determining how to proceed in investigating the particular wrongdoing before it. *Id.* at 828.

Specifically, the majority exhaustively illustrated how the general and fluid precepts of earlier authority could not give the defendant school officials sufficient notice that their particular conduct was unconstitutional, even assuming, of course, that it was unconstitutional. Having demonstrated the absence of clear legal authority to inform the officials of any unlawfulness of their actions, the court could have stopped there. It proceeded, however, to make certain observations about the propriety of the particular search. For example, the court noted its belief that the strip searches were reasonably related to the objective of finding the missing $7.00. *Jenkins,* 115 F.3d at 827 n. 5. Further, in response to the plaintiffs' argument that the theft of a small amount of money should not trigger a step as intrusive as a strip search, the court "reject[ed plaintiffs'] attempt to trivialize the nature of the infraction; the stealing of $7.00 in an elementary classroom reasonably could be considered by the school officials to be a matter of serious concern." *Id.* Indeed, bolstering this last point, the court quoted the majority opinion in *T.L.O.*:

We are unwilling to adopt a standard under which the legality of a search is dependent upon a judge's evaluation of the relative importance of various school rules. The maintenance of discipline in the schools requires not only that students be restrained from assaulting one another, abusing drugs and alcohol, and committing other crimes, but also that students conform themselves to the standards of conduct prescribed by school authorities.... The promulgation of a rule forbidding specified conduct presumably reflects a judgment on the part of school officials that such conduct is destructive of school order or of a proper educational environment. Absent any suggestion that the rule violates some substantive constitutional guarantee, the courts should, as a general matter, defer to that judgment and refrain from attempting to distinguish between rules that are important to the preservation of order in the schools and rules that are not.

*Id.* at 828 (quoting *T.L.O.,* 469 U.S. at 342 n. 9, 105 S.Ct. 733). Summarizing in its own words the teachings of *T.L.O.,* the en banc court concluded:

Faced with a series of abstraction, on the one hand, and a declaration of seeming deference to the judgments of school officials, on the other, it is difficult to discern how *T.L.O.* could be interpreted to compel the conclusion that these defendants—or, more accurately, all reasonable educators standing in defendants' place—should have known that their conduct violated a clearly established constitutional right.

*Id.* Qualified immunity notwithstanding, that the court in *Jenkins* chose not to go ahead and denounce the search on constitutional grounds, so that future educators would not conduct strip searches in these circumstances, and that the court articulated sympathy toward the school officials in their difficult task of maintaining order,

suggests, at the least, that the court was not convinced that the strip search in its case was unconstitutional.

Looking outside the Eleventh Circuit, at least two other circuits have confronted the issue of strip searches of students within the context of a public school setting. *Doe v. Renfrow*, 631 F.2d 91 (7th Cir.1980),[16] involved a strip search of a thirteen-year-old girl in a public school where the search was performed without reasonable cause to believe the child possessed contraband.[17] Finding the search to be illegal, a panel of the Seventh Circuit declared:

> It does not require a constitutional scholar to conclude that a nude search of a thirteen-year-old child is an invasion of constitutional rights of some magnitude. More than that: it is a violation of any known principal of human decency. Apart from any constitutional readings and rulings, simple common sense would indicate that the conduct of the school officials in permitting such a nude search was not only unlawful but outrageous under "settled indisputable principles of law."

*Id.* at 92–93. Moreover, the panel stated, "We suggest as strongly as possible that the conduct herein described exceeded the 'bounds of reason' by two and a half country miles." *Id.* at 93.

In *Tarter v. Raybuck*, 742 F.2d 977 (6th Cir.1984), a panel of the Sixth Circuit addressed, and upheld, a search of a high school student by school authorities. In that case, the plaintiff, a high school junior, was suspected of selling marijuana to another student on campus. Several school officials, who had witnessed what they thought to be an exchange of marijuana between plaintiff and another student, ordered the student into the clinic of the school and asked him to empty his pockets and remove his jacket, boots, and shirt. Plaintiff complied with the officials' request but refused to remove his pants. *Id.* at 979–80.

Although this case predated the Supreme Court's *T.L.O.* decision, a panel of the Sixth Circuit analyzed the search utilizing a two-prong analysis. First, the panel held "that a school official or teacher's reasonable search of a student's person does not violate the student's fourth amendment rights, if the school official has reasonable cause to believe that the search is necessary in the furtherance of maintaining school discipline and order, or his duty to maintain a safe environment conducive to education." *Id.* at 982. Second, the panel noted "that not only must there be a reasonable ground to institute the search, the search itself must be reasonable."[18] *Id.* Utilizing this analysis, the panel determined that the school officials clearly had reasonable grounds for the search because they had personally witnessed plaintiff engaged in what they reasonably believed was a sale of drugs. *Id.* at 983. The panel found that the defendants "had particularized suspicion of spe-

---

**16.** This case was decided prior to the Supreme Court's ruling in *T.L.O.* and does not analyze the strip search in terms of the two-prong analysis mandated by that case.

**17.** Apparently, the trial court found that the search was performed without reasonable cause to believe that the girl possessed contraband. The defendants did not appeal the trial court's determination and accordingly the panel did not consider whether the trial court erred in determining that the school official did not possess reasonable cause to support the search. *Doe*, 631 F.2d at 92.

**18.** Relying on the Seventh Circuit opinion in *Doe* discussed above, the panel cautioned that "the authority of the school official would not justify a degrading body cavity search of a youth to determine whether a student was in possession of contraband in violation of school rules. There the fourth amendment and privacy interests of the youth would clearly outweigh any interest in school discipline or order which may be served by such a search." *Tarter*, 742 F.2d at 982–83.

cific individuals" and "were not making a general search of a large group of students." *Id.* Moreover, the panel found that the search was reasonable in scope. *Id.* at 984 n. 7.

In *Cornfield v. Consolidated High School District No. 230*, 991 F.2d 1316 (7th Cir.1993), a panel of the Seventh Circuit once again addressed a strip search of a high school student in a public school. Addressing T.L.O.'s first prong, the reasonable suspicion prong, the panel noted "as the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness. What may constitute reasonable suspicion for a search of a locker or even a pocket or pocketbook may fall well short of reasonableness for a nude search." *Id.* at 1321. As to the second prong, the panel noted that "[a] nude search of a student by an administrator or teacher of the opposite sex would obviously violate this standard," as would "a highly intrusive search in response to a minor infraction." *Id.* at 1320.

Turning to the facts of the case, the panel recognized that the officials relied on several sources of information to justify their search, "the cumulative effect of which is sufficient to create a reasonable suspicion that [plaintiff] was crotching [19] drugs." *Id.* at 1323 (footnote added). Addressing the second prong, although the panel found that "the sixteen-year-old [plaintiff] was of an age at which children are extremely self-conscious about their bodies," it determined that the search of the child was permissible in scope because the male officials performed the non-body cavity search on the nude male student in the privacy of a locked locker room where no other students could see him. *Id.* Accordingly, the panel determined that the school officials did not violate the plaintiff's Fourth Amendment rights by conducting

the nude search of the sixteen-year-old boy.

In addition to the circuit opinions discussed above, one recent district court case merits discussion, as it is factually similar to the case at hand. In *Konop v. Northwestern School District*, 26 F.Supp.2d 1189 (D.S.D.1998), $200 was reported missing to the principal of a high school. The principal asked the eighth grade girls to remain in the lunchroom and announced his intention to search them until he found the missing money. *Id.* at 1202. The principal ordered each student to place the contents of their pockets on the tables in front of them so that he could inspect them. After this search turned up no money, the principal asked several female employees to take two girls at a time to the locker room to search them for the missing money. *Id.* These girls were ordered "to strip like they were in physical education class," and then searched. *Id.* at 1203. After all the girls were searched unsuccessfully, the principal searched lockers, book lockers, and cars for the money. *Id.* at 1202.

After reviewing case law from around the country, including the cases cited *supra*, the district court reasoned:

> T.L.O. has been applied time and time again and certain rules are clear: (1) a strip search is not justified absent individualized suspicion unless there is a legitimate safety concern (e.g.weapons); (2) school officials must be investigating allegations of violation of the law or school rules and only individual accusations justify a strip search; and (3) strip searches must be designed to be minimally intrusive, taking into account the item for which the search is conducted.

*Id.* at 1201. Relying on these observations, the court concluded that the strip

---

**19.** "Crotching" drugs involves hiding drugs in the crotch area of one's pants or under- wear.

searches were illegal.[20]

While two of the above cases from outside the Eleventh Circuit suggest that the search in this case was unconstitutional, these cases are of persuasive value only; as noted, the Eleventh Circuit has not ruled dispositively on the question before this Court. That being so, this Court is forced to decide, without the benefit of Eleventh Circuit precedent, whether the search here was reasonable. It does so, well aware that such judicial line-drawing necessarily occurs after the fact, without the exigencies faced by the school official. Accordingly, in appraising the reasonableness of a particular disciplinary or investigative action by a school official, both the Supreme Court and Eleventh Circuit advocate some deference toward the decisions of often beleaguered educators who serve in the trenches everyday. For that reason, any decision that a particular action by a school official exceeded constitutional limits should be as narrowly drawn as possible, as a broader rule may not consider other potential incidents not before the Court and, accordingly, may be overly expansive in its reach.

■ In this case, one must evaluate several variables: the extent to which suspicion must be individualized to warrant any kind of search; the propriety of strip searches, generally, in a school setting; and the appropriate level of intrusiveness of a search, given non-individualized suspicion. Further, the Court must filter these variables through the two-part test set out in *T.L.O.*: (1) whether the action was justified at its inception and (2) whether the search as actually conducted was reasonable in scope. The Court interprets the first prong as looking to whether there was sufficient justification to engage in any sort of "encounter" with or search of the

student and the second prong as triggering an inquiry whether the particular encounter or search was reasonable based on the suspicious facts triggering its use.

■ Looking first to the degree to which suspicion must be individualized, as a general matter, this Court cannot conclude, as plaintiffs suggest, that individualized suspicion is always necessary before any type of search may be undertaken in a school setting. If, for example, school officials received information that an unidentified student had hidden a bomb somewhere in the school, this Court assumes that the school would be acting reasonably—and thus constitutionally—if it searched the lockers and book bags of every student in the school, even though it is clear under this hypothetical that the school officials would possess no individualized suspicion as to any one student.

Further, the term "individualized suspicion," itself, somewhat begs definition. For example, if a school official receives information that a student may possess contraband, this official clearly has "individualized suspicion" directed toward that student. If the official learns, however, that this student, plus two other students, had been seen at different times that day with the contraband—apparently, the facts in *Jenkins*—but that at the time of the information, it is not clear which one, if any of these three children, presently have the items, then there is clearly some suspicion directed at each of the three children, even though it is clear that only one of the children will likely be in possession of the contraband at any one time and even though there is no greater suspicion of any one of the three children than of the other two.

Another example: if the school official receives credible information that a stu-

---

**20.** The district court did not even address the unconstitutionality of the searches, rejecting without discussion defendants' claim that the searches were reasonable under the *T.L.O.* standard. *Konop,* 26 F.Supp.2d at 1192. The court spent the bulk of the opinion determining that defendants were not entitled to qualified immunity.

dent is secreting guns or bombs or drugs or some other contraband and further that, by his attire, the informant can discern that the unidentified student is a member of a ten-member high school gang whose members wear this distinctive attire, this Court will also assume that the school official might well be justified, at the least, in searching the bags and lockers of these ten members of the gang. Obviously, with the expansion of the group to which the "individualized suspicion" attaches, the analysis gets trickier, for which reason the word "individualized" begins to offer little assistance and, instead, the term "suspicion" or "reasonable suspicion" becomes the operative term.

Accordingly, applying the first prong of *T.L.O.* to this case, the Court concludes that the teacher had the requisite suspicion to conduct some type of search of the students in her fifth grade class for the missing $26.00. The teacher had reason to believe that the money was missing: a student had told her that he had put this money on her desk moments before and that the money had disappeared. Allowing a theft to go undiscovered and unsanctioned would not have promoted the long-term well-being of the thief or the victim, as the latter was out money that he had earned selling candy for a school trip and the former would have intuited early in life that crime does pay. Moreover, the deterrence value of a search could arguably insure that other would-be thieves would think twice before purloining another student's valuables. A school that takes a casual attitude toward the theft of another student's candy money may well soon encounter disobedience of even more serious rules, as well as the erosion of order and a sense of well-being by students. Accordingly, had the teacher limited her search to a search of the book bags, desks, or purses

of the students in the class, this Court would have no problem concluding that such measures were reasonable pursuant to the second prong of the *T.L.O.* test, which governs the appropriateness of the particular type of search undertaken. Looking in a fifth grader's personal belongings, which presumably teachers sometimes do anyway to find missing homework or misplaced books, does not strike this Court as overly intrusive. Indeed, had the teacher required the children to empty their pockets or even take off their shoes and socks to search for the money, the Court would not view that measure as unreasonable.

In this case, however, the teacher went beyond the above steps and also imposed a "strip search"[21] on each of the fifth graders, requiring each student, in the presence of other students of the same sex, to partially undress. That event first triggers a need to determine whether strip searches are ever reasonable in a school setting. From a reading of the earlier cited cases, this Court concludes that strip searches can sometimes be sustainable in a school setting if, for example, the school official has reasonable suspicion that a particular student may be in possession of dangerous items, drugs, contraband, stolen items, or the like.

The next obvious question then is: if strip searches may conceivably be legal when the teacher had a particularized suspicion that one, or a few, students are in possession of contraband, can such searches ever be justified under the circumstances present in this case, in which the teacher reasonably suspects that at least one of the twenty-two students in her class was in possession of the item, but she does not know which of the twenty-two pupils is the culprit? The Court does not

---

**21.** The Court uses the term "strip search" as a shorthand expression. Because the descriptions of the type of searches conducted here vary widely, it is not clear that the searches actually required a complete disrobing, as would a strip search in a penal or police setting.

foreclose the possibility that there could be circumstances under which the answer would be yes. The Court assumes, without deciding, that if the item suspected of being hidden were a dangerous weapon, drugs, or even a very valuable stolen item, a more intrusive search of the entire class might, in some circumstances, be sustainable. Nevertheless, the Court concludes that the search in this case was not reasonable under all the circumstances: meaning that the search was unconstitutional.

As this Court has noted that it might well uphold a strip search, under these facts, where the item in question was a weapon or possibly even drugs or maybe even just a very valuable stolen item, the distinction that therefore necessarily controls the Court's decision is the nature of the particular item being sought. The Court concludes that where the item missing is only a small amount of money and where there is no particularized suspicion that a particular child has the money, a strip search of the entire class is disproportionate to the harm sought to be remedied, and hence unreasonable.

In concluding that the strip search was an excessive response to the theft of the $26.00, but noting that it would not automatically so conclude were the contraband in question a weapon, drugs, or valuable contraband, this Court is necessarily weighing the various infractions involved and giving lesser weight to the theft of $26.00 than to the possession of the other types of contraband. Accordingly, the Court might appear to be in violation of Justice White's and the Eleventh Circuit's directive that the legality of a search should not be dependant on the judge's evaluation of the relative importance of various school rules. See discussion *supra* at 1302–03.

In response to such criticism, however, the Court would offer two responses.

First, to apply the second prong of *T.L.O.*—whether the search was too intrusive to be considered reasonable—the Court has to have some frame of reference for reasonableness in determining the appropriateness of the intrusion. Second, and more importantly, however, this holding is not inconsistent with *T.L.O.* or *Jenkins* because the Court's assessment of the importance of the rule being violated is triggered only when there is no particularized suspicion of the person being searched. Accordingly, when there is merely generalized suspicion that one member of an entire class is hiding some contraband, the nature of the contraband becomes an important consideration in deciding how intrusive the search should be. When the official has a particularized suspicion that a student or students are concealing the contraband, however, a weighing by a court of the danger or value of the contraband—and hence an assessment of the seriousness of the rule violation—concededly could become quite problematic. *Cf. Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (holding as long as police officer has probable cause to believe that traffic violation has occurred, officer may stop the car regardless of the triviality of traffic law which is violated and regardless of officer's subjective motives for the stop). *See also Ohio v. Robinette*, 519 U.S. 33, 38, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

In summary, the Court concludes that the searches in this case exceeded the bounds of reasonableness, which means that they also exceeded constitutional limits.

### 2. *Qualified Immunity*

Determining that the searches were unconstitutional, however, is just the first step in deciding whether any of the defendants have liability. Plaintiffs seek monetary damages as a result of the searches at issue and can look to only two sources to

recover that money: the individual defendants who were involved in the search and/or the governmental entities that employed these people. The individual defendants—Matthews, Morgan, Roberts, and Billingslea—argue that they enjoy qualified immunity as to these official acts that they undertook in good faith. Plaintiffs, on the other hand, contend that the law governing searches and seizures was clearly established at the time the searches were conducted and therefore these individuals were necessarily on notice that their actions violated the law.

■ "Qualified immunity protects government officials performing discretionary functions from civil trials (and the other burdens of litigation, including discovery) and from liability if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lassiter v. Alabama A & M Univ.*, 28 F.3d 1146, 1149 (11th Cir.1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). "For the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place that 'what he is doing' violates federal law." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635,

640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Once the defendant makes this showing, "the burden is on the plaintiff to show that, when the defendant acted, the law established the contours of a right so clearly that a reasonable official would have understood his acts were unlawful." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir.1993), *modified*, 14 F.3d 583 (1994). Accordingly, there is a two-prong test to determine if qualified immunity applies: (1) were defendants performing a discretionary function when they were performing the search at issue in this case and (2) did defendants' actions violate "clearly established law?"

■ As to the first inquiry, plaintiffs fail to address whether the defendants were performing discretionary functions when they performed the searches in question in this case.[22] Hence, the Court concludes that there is no dispute that the individual defendants in this case were performing a discretionary function when they executed the searches at issue. Since "[t]here is no doubt in the present case that the officers were acting within their discretionary authority, ... the sole issue is whether their actions violated clearly established law." *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir.1995). The burden is on the plaintiffs to show that the defendants violated clearly established law. *Id.* Plaintiffs cannot discharge this burden "simply by

**22.** In the context of their arguments regarding state law immunity, plaintiffs argue that the acts of Morgan and Billingslea were ministerial, and not discretionary, because they were directed to perform the searches by Roberts. (Pls.' Br. [83] at 47.) Although the distinction between ministerial and discretionary duties may be crucial in determining whether state law immunity exists, the Eleventh Circuit has explained " 'it would be unwise to engage in a case by case. determination of Section 1983 immunity based upon the ministerial versus discretionary nature of the particular official act charged.' " *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir.1994) (quoting *Coleman v. Frantz*, 754 F.2d 719, 727 (7th Cir.1985)). Nevertheless, plaintiffs do not contest defendants' assertion that, in the

context of the issue of qualified immunity, Morgan and Billingslea were performing discretionary functions—that is, their actions " '(1) were undertaken pursuant to the performance of [their] duties,' and (2) were 'within the scope of [their] authority.' " *Id.* (quoting *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir.1988)).

Moreover, plaintiffs do not attempt to argue that the acts by Roberts and Matthews were not discretionary as plaintiffs consistently claim that Clayton County principals and assistant principals are given the final decision-making authority on whether to conduct searches in the schools. (Pls.' Br. [83] at 47.)

referring to general rules or abstract rights" but, rather, must point to clearly established law. *Id.* at 954. "When considering whether the law applicable to certain facts is clearly established, the facts of the cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar." *Adams v. St. Lucie Co. Sheriff's Dept.,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmonson, J., dissenting), *approved en banc,* 998 F.2d 923 (11th Cir.1993). However, to be clearly established "does not mean that a court must have previously found the very action in question to be unlawful, but it does mean that 'in light of preexisting law the unlawfulness must be apparent.'" *Jordan v. Doe,* 38 F.3d 1559, 1566 (11th Cir. 1994) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

■ The qualified immunity question presented in this case is whether Fourth Amendment law "clearly established" that the searches of the children in this case was unconstitutional. The crucial date for determining the state of school search law is the date that the searches took place, October 31, 1996. For law to be clearly established, it must have been in effect at the time of the alleged unconstitutional conduct. "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins v. Talladega City Bd. of Educ.,* 115 F.3d 821, 827 n. 4 (11th Cir.1997).

■ Plaintiffs argue that several cases clearly establish that the searches in question in this case were unconstitutional. Specifically, plaintiffs argue that "[c]om-

pelling eleven-year-old children to submit to a mass strip search in the absence of a valid reason to suspect any individual student of wrongdoing, and reason to know many could not have engaged in wrongdoing, is clearly prohibited by the Fourth Amendment." (Pls.' Br. [83] at 7.) Plaintiffs rely on the standard enunciated by the Supreme Court in *New Jersey v. T.L.O,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), discussed *supra,* and argue that this standard mandates individualized suspicion prior to searching students at a public school. Furthermore, plaintiffs argue that the Eleventh Circuit's panel decision and subsequent en banc decision in *Jenkins v. Talladega City School Board,* 95 F.3d 1036 (11th Cir.1996), *vacated on reh'g en banc,* 115 F.3d 821 (11th Cir.1997) (en banc), follows *T.L.O.'s* individualized suspicion standard. Finally, plaintiffs argue that *C.B. v. Driscoll,* 82 F.3d 383 (11th Cir.1996) and *Justice v. City of Peachtree City,* 961 F.2d 188 (11th Cir.1992) provide "concrete application of the particular suspicion requirement to student/juvenile searches." (Pls.' Br. [83] at 9.)

Accordingly, although this Court has decided that the search in question exceeded constitutional limits, the more immediate question is whether the law had been "developed in such a concrete and factually defined context" as to make it obvious to a reasonable person in defendants' place that the latter were violating federal law. The Court concludes that the law, as cited by plaintiff, was not so developed in this circuit as to unequivocally trigger an awareness in defendants that they were clearly violating the law. First, *T.L.O.,* with its very general and abstract command only of reasonableness, does not offer much specific guidance of any sort.[23] As to the Eleventh Circuit cases cited by

**23.** As Judge Birch persuasively notes in *Jenkins,* it is likely no accident that the Supreme Court has eschewed a code book approach to

advising school official of the parameters of their authority to search. 115 F.3d. at 827–28. With the variety of potential situations

plaintiff, *Justice v. City of Peachtree City*, 961 F.2d 188, 189 (11th Cir.1992), discussed *supra*, upheld a strip search of a juvenile detainee where there was reasonable suspicion to believe that she was in possession of drugs. In *C.B. v. Driscoll*, 82 F.3d 383, 385 (11th Cir.1996), the Eleventh Circuit found that school administrators had the requisite suspicion to search the outer pockets of a student's coat based on a tip provided by another student that the former student was carrying drugs in his coat. Clearly, had the courts in *Justice* and *C.B.* held that the information known to the respective searching officials did *not* provide the necessary suspicion for the strip search and search of a coat, respectively, one could readily infer that the level of suspicion present in this case clearly would not warrant the search here. As these decisions upheld the searches before them, however, one can not *necessarily* infer that a search based on less specific information would not also be sustained.

Plaintiffs also rely on both the panel and en banc decisions in *Jenkins v. Talladega City Board of Education*, 95 F.3d 1036 (11th Cir.1996), *vacated on reh'g en banc*, 115 F.3d 821 (11th Cir.1997). *See* discussion *supra* at 1302–03. In the original panel decision [*Jenkins I* ], a panel of the Eleventh Circuit found that "reasonable grounds" existed to permit the search of the backpack of three children suspected of stealing money and perhaps even the search of the children's shoes and socks. 95 F.3d at 1044. In finding the two strip

searches to be unconstitutional, however, the panel concluded that "the glaring disproportion between the measures adopted and the trivial nature of the infraction—point unequivocally to the unreasonableness of the two restroom searches (strip searches) at issue here." *Id.* at 1047.

Were *Jenkins I* the last word, plaintiffs would prevail in their argument that the law clearly established the unconstitutionality of these searches at the time that they were conducted. *Jenkins I*, however, was vacated on October 16, 1996, two weeks before the search occurred in the instant case, and subsequently reheard en banc. *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821 (11th Cir.1997) (en banc) (hereinafter "*Jenkins II* "). In *Jenkins II*, Judge Birch, the author of the dissent in the original panel decision, penned the opinion for the majority. As discussed *supra*, Judge Birch determined that the defendants enjoyed qualified immunity and did not expressly rule on whether the actions of the teachers and guidance counselor in the case violated the Fourth Amendment.[24] *Id.* at 824 n. 2, 828.

Specifically, the en banc court held that the Supreme Court's decision in *T.L.O.* could not form the basis of the "clearly established law" required to defeat the defense of qualified immunity. Although the *T.L.O.* Court enunciated a standard by which school searches were to be analyzed, the en banc court found that this test gives "no illustration, indication, or hint as to how the enumerated factors might come into play when other concrete circum-

faced by school officials and the need to give some deference to those individuals in handling their challenging jobs, it would be difficult and unwise to lay down detailed guidelines.

24. Nevertheless, Judge Birch, in a footnote, suggested that the strip search of the two girls, as performed, was reasonable in scope. Classifying the theft of seven dollars in an elementary school as a "matter of serious concern," Judge Birch relied on the facts that the girls were searched by female teachers and the "common experience that teachers frequently assist students of that age in the bathroom," to determine that "it would not be apparent to a reasonable school official that the challenged searches were 'excessively intrusive in light of the age and sex of the student[s] and the nature of the infraction.' " *Jenkins II*, 115 F.3d at 827 n. 5 (quoting *T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733). See discussion *supra*.

stances are faced by school personnel." *Id.* at 825. As no other cases from the Alabama Supreme Court or the Eleventh Circuit had applied *T.L.O.* in factually similar circumstances, the en banc court held that "[w]ithout such practical, fact-based application, school officials in this circuit were left to interpret, balance, and evaluate such terms as 'measures ... reasonably related to the objectives of the search,' and 'not excessively intrusive in light of the age and sex of the student and the nature of the infraction.'" *Id.·* at 826–27 (citing *T.L.O.*, 469 U.S. at 342, 105 S.Ct. 733). As "'public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases,'" the panel found that the defendants were entitled to qualified immunity. *Id.* at 827, 105 S.Ct. 733 (quoting *Adams v. St. Lucie County Sheriff's Dept.*, 962 F.2d 1563 (11th Cir.1992), *approved en banc*, 998 F.2d 923 (11th Cir.1993)).

For purposes of qualified immunity, the Court must determine that one of the cases cited by plaintiffs would have put the defendants on notice that their actions were in violation of the Fourth Amendment. Although plaintiffs characterize the holdings of *Justice, C.B., Jenkins I, Jenkins II,* and *T.L.O.* as mandating individualized suspicion in student search cases, this characterization is not correct. None of the cases expressly dictate the requirement of individualized suspicion in the school setting or otherwise form the basis of clearly established law as to the specific type of facts present here. A school official reading any one or all of the four cases would not be left with the firm impression that the search in question in this case violated the Constitution. Moreover, the discussion undergone by this Court *supra* in ultimately deciding the constitutionality of the searches should illustrate the uncertainty, and factually intensive nature, of any such decision.

Indeed, the doctrine of qualified immunity purposely sets high hurdles before a litigant can demand crippling monetary damages from a civil servant who is merely doing her job, even when a hind-sight appraisal of the employee's job-related decision may suggest that the employee has made a bad judgment call. Most people will presumably react quite negatively to a teacher's decision to perform a modified strip search of fifth graders to recover money stolen from another student; indeed, this Court has concluded that this decision by the teacher constituted an excessive reaction to the problem that she was facing. The teacher contends, however, that the situation facing her was less clear-cut than it might initially appear. This teacher, Ms. Morgan, taught a fifth grade class in which most of the students were too poor to be able to afford to buy their lunch. (Morgan Dep. at 60, 189.) When young Sergio Evans, who had worked to sell candy so that he could go on a class trip to Tennessee, reported to her that the envelope containing his $26 in candy money was missing, Ms. Morgan indicated that she was concerned and wanted very badly to locate the money for Sergio. As Ms. Morgan noted in her deposition testimony, the loss of $26 may not have seemed serious to an adult, but she perceived it as a serious problem for this child. (*Id.* at 113.) Accordingly, she took numerous steps, including cleaning out trash cans, calling Sergio's mother to insure that the money had not been left in the car, and searching through the student's belongings before she initiated the search of the students' persons. She could have had a much less stressful morning had she refused to get involved in solving Sergio's loss and instead had simply moved on to the more tranquil activities planned for that day. In short, it is clear to this Court that in directing these searches, Ms. Morgan acted out of no malevolence to her class, but instead did what she thought was the right thing to do. That this Court now disagrees with the wisdom of her decision, however, does not mean that she

must become personally liable for her bad judgment, absent the existence of clear legal authority that should have put her on notice of the error in her decision.

Accordingly, the doctrine of qualified immunity protects a teacher who makes a mistake in judgment, even when a federal court determines that, in hindsight, the teacher's acts exceeded a judicially set standard. The Supreme Court and the Eleventh Circuit have determined that this immunity will not be defeated unless the actions in question have been previously determined to be unconstitutional, such that the government official would necessarily be on notice that his or her actions violated the Constitution. This Court determines that plaintiffs did not meet this high standard for defeating qualified immunity. Moreover, in arguing that the law here was clearly established, plaintiffs are attempting to ask the Court to draw a conclusion at odds with the holding by the en banc Eleventh Circuit in *Jenkins II.* Accordingly, defendants Matthews,[25] Roberts, Morgan, and Billingslea's motions for summary judgement are **GRANTED** as to all claims against them in their individual capacities.[26]

## B. Municipal Liability Claims Against the Clayton County School District

■■■■■ If plaintiffs cannot compel monetary damages from the individual defendants, they can acquire such damages only if they prove that one of the governmental bodies sued is responsible for the constitu-

tional violation. Plaintiffs claim that the Clayton County School District should be liable under 42 U.S.C. § 1983 for the unconstitutional searches of the elementary school students. In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities may not be found liable under 42 U.S.C. § 1983 on a theory of respondeat superior. *See also Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir.1997). A local government is only liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Mandel v. Doe*, 888 F.2d 783, 791 (11th Cir.1989) (citing *Monell*, 436 U.S. at 694, 98 S.Ct. 2018). It is by now well established that § 1983 liability may not be based on an employment relationship linking the local government to the offending employee; rather, "[r]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

In the instant case, plaintiffs allege that Clayton County School District is responsible for the unconstitutional searches of the students under three theories: (1) that assistant principal Roberts acted as a final policymaker when she authorized the searches of the students by Morgan and

---

25. Of course, as plaintiffs have submitted no evidence that defendant Matthews either approved of or conducted the searches, he is also entitled to summary judgment on the merits.

26. Plaintiffs have also brought official capacity claims against defendants Matthews and Roberts regarding plaintiffs' claims against them in the supervisory capacities. Plaintiffs' supervisory liability claim against Roberts is based on the latter's alleged authorization of the searches. Matthews' supervisory liability

is based on plaintiffs' assertion that he ratified the searches. (Pls.' Br. [83] at 8 n. 3.) A claim against a public official in his official capacity equates to a claim against the agency for which the official works. *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Accordingly, these supervisory liability claims are folded into the claims against the Clayton County School District addressed *infra.*

Billingslea; (2) that the school district failed to supervise or train its employees and condoned a policy of permitting searches· of students' persons in violation of the Constitution; and (3) that the school district ratified the searches by "exonerating everyone and taking no corrective action." (Pls.' Br. [81] at 23.) The Court will address each theory in turn.

### 1. *Municipal Liability Based on a Single Decision*

■ In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court explained that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *See Scala* 116 F.3d at 1399. Moreover, "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is taken only once or to be taken repeatedly." *Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292. "Thus, liability may arise from 'a course of action tailored to a particular situation and not intended to control decisions in later situations' ... provided that 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Scala*, 116 F.3d at 1399 (citations omitted) (quoting *Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292). As long as the decisionmaker's decision is final, the municipality can be held liable under § 1983. *Id.* at 1401; *accord McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir.1996), *aff'd*, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997).

■ The determination of whether a municipal employee is the final decisionmaker is a question of law. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1480 n. 10 (11th Cir.1991); and *Mandel*,

888 F.2d at 793. Moreover, "[w]hether a particular official has final policymaking authority is a question of state law," and should be determined by looking "to state and local positive law, as well as custom and usage having the force of law." *Brown*, 923 F.2d at 1480; *McMillian*, 88 F.3d at 1577.

■ Plaintiffs' strongest argument for liability for the school district lies in their argument that assistant principal Roberts was the final decisionmaker for purposes of the searches at issue in this case. Hence, the Court must decide first if Roberts was a final decisionmaker and, if so, the Court must then determine whether her cryptic authorization to Morgan to conduct a search can be said to fairly represent official policy of the school district. Stated another way, was Roberts' very brief acquiescence to Morgan's request to search the students the equivalent of a policy decision by the school district permitting strip searches in a situation where there was no particularized suspicion?

Initially, the Court must look to Clayton County School District publications and state law to determine whether the principal and assistant principal have the authority to authorize searches of students. Turning to Clayton County's policy on search, the policy states:

> Students in the district have the right to privacy and security against arbitrary invasion of their personal property by school officials. However, the Board must maintain an atmosphere conducive to the pursuit of its educational goals, including a limited right to search students' personal belongings when it is in the interest of the overall welfare of other students or is necessary to preserve the good order and discipline of the school.

> Lockers shall be opened or other searches conducted by not less than two members of the professional staff.

(Pls.' School Exs. [84] at Ex. 1.) In addition, the Clayton County School District's 1996–97 Student and Parent Handbook, distributed to students, parents, teachers, and administrators contains the following language authorizing searches: "School administrators, or their designated representatives, possess the authority to conduct a reasonable search of students and their possessions when on school property. The administrator is required to have only reasonable suspicion to conduct such searches." (Def. Clayton County School District's Mot. for Summ.J. [65] at Bass and Warren Affs. at Ex. 1.) Moreover, the principal's job description includes a responsibility to "[e]stablish guidelines for proper conduct and maintain student discipline" while the assistant principal must "[a]ssume responsibility for carrying out the duties of the principal during his/her absence." (Pls.' School Exs. [84] at Exs. 4, 5.) Moreover, plaintiffs submit the deposition testimony of several witnesses who agree that "the principal or assistant principal of a school are 'ultimately responsible' for authorizing any searches." (Matthews Dep. at 24; Roberts Dep. at 23, 27, 28; Hairston Dep. at 8; Whiteman Dep. at 15–16; Warren Dep. at 15–16.)

Considering this evidence, the Court concludes that principals and assistant principals have the authority to approve searches in their schools within the parameters of the school district's policy. As to the policy, the school district indicates that students have a right to be free from the arbitrary invasion of their property, but that the school can search their personal belongings when necessary in the interest of the students' welfare or in order to preserve order in the school. Lockers are specifically mentioned as a proper subject of a search. The handbook supplements this policy statement with the authorization to administrators to conduct a reasonable search of students and possessions based on reasonable suspicion. Collapsing these two sources of school district policy, the school district has a policy that searches of students' persons or property shall be made only upon reasonable suspicion. The policy is silent, however, on the propriety of "strip searches."

From these facts, one could draw one of two conclusions. One could conclude, as the county argues, that the policy called only for searches based upon reasonable suspicion, that a search not made on that basis did not represent the policy of the school district and, accordingly, that the school district is not responsible for such a decision. (Def.'s Mot. [81] at 14.) Alternatively, one could conclude, as plaintiffs argue, that where a policy itself permits those carrying out the policy to determine the ultimate issue—the reasonableness of the search—then every time a principal conducts a search of a student, that decision represents official policy for which the school district is responsible. In support of this argument, plaintiffs point to cases that hold that where a decision is not subject to meaningful administrative review, then it is necessarily the decision of a "final" decisionmaker.

At the outset, the Court notes that were it reading only Supreme Court authority on this subject, the first argument would clearly appear more meritorious than the second argument. That is, *Monell* and its progeny have made it clear that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Indeed, several years later, the Court reiterated that "tortious conduct, to be the basis for municipal liability under § 1983, must be pursuant to a municipality's 'official policy' and 'recovery from a municipality is limited to acts

that are, properly speaking, acts of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Pembaur,* 475 U.S. at 479–80, 106 S.Ct. 1292.

Further, a single decision by an employee can confer liability on the entity only where that employee can reasonably be viewed as a policymaker with final authority to establish governmental policy regarding the action ordered. *See id.* at 480, 106 S.Ct. 1292. The Supreme Court has cautioned, however, that "[t]he fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 481–82, 106 S.Ct. 1292. Finally, as the plurality in *City of St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), observed, "Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make *policy.* It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them."

Applying only the above reasoning to this case, the Court would conclude that the school district should not be liable in this case for the actions of assistant principal Roberts. At the time of the searches at issue in this case, the school district had a policy calling for reasonable suspicion. While, as plaintiffs note, the policy could perhaps have been fleshed out in somewhat greater detail, the Court is not sure how much more detailed it could require such a policy to be. As illuminated in the previous discussion on the legality of the

searches here, it is clear that the courts have set out very scant authority to guide school officials in their determination whether to conduct a particular search. Moreover, the Eleventh Circuit has noted that the absence of detailed federal court guidelines governing school searches has been purposefully done, as courts recognize that the decision to conduct a search will be very fact-intensive and that school officials are entitled to much deference in their determination of the best means to effect order, discipline, and the well-being of their school body. *See Jenkins II,* 115 F.3d at 827–28. If federal courts are unable, in advance, to set out detailed policies on school searches, it seems a bit unfair to require school districts to do much more than call for reasonableness on the part of their school administrators when the latter decide to conduct a search.[27]

Having a policy that calls for reasonableness, the school district did not delegate to assistant principal Roberts the authority to change that policy to one of unreasonableness. *See Pembaur,* 475 U.S. at 486, 106 S.Ct. 1292 (White, J., concurring) ("Where the controlling law places limits on [law enforcement officers'] authority, they cannot be said to have the authority to make contrary policy.... Such results would not conform to *Monell* and the cases following it.... A sheriff, for example, is not the final policymaker with respect to the probable-cause requirement for a valid arrest. He has no alternative but to act in accordance with the established standard; and his deliberate or mistaken departure from the controlling law of arrest would not represent municipal policy.") Where a subordinate executes the policy in an incorrect or unreasonable manner, the aggrieved student may sue that employee individually. If the

---

**27.** While the courts may not be able to fault a school district for the absence of a detailed policy where that school district has experienced no significant problems with searches conducted by school administrators, it still might be prudent for a school district that seeks to protect itself in these litigious times to draft a somewhat fuller and more risk-averse policy than that in existence for the Clayton County School System.

illegality of the action is clearly established in prior case authority, the individual employee will be held liable; if not clearly established, the individual employee will not be held liable. The inability to hold the employee liable in the latter event, however, does not translate into an imperative that the employing governmental agency should automatically be held liable. If the employee could not know that her actions were unreasonable, and hence illegal, there is no sound justification, other than a respondeat superior theory, for holding liable the employer who had a policy forbidding unreasonable acts by its employees;[28] *Monell* and its progeny are quite clear, however, in disclaiming the use of a respondeat superior theory. In short, left to a reading of Supreme Court cases, this Court would conclude that Roberts' alleged authorization of this search did not represent county policy, but instead merely reflected her determination of what would be a reasonable search under the circumstances. *See Pembaur,* 475 U.S. at 481–82, 106 S.Ct. 1292.

The Court cannot stop with Supreme Court authority, however, but must also look to Eleventh Circuit precedent to determine how that court has interpreted Supreme Court authority. The Eleventh Circuit appears not to have confronted the question whether a principal's decision to authorize a search constitutes the action of a final policymaker, thereby subjecting the school district to liability if a federal court, after the fact, disagrees with the principal's particular exercise of judgment. The Seventh Circuit, however, has addressed this matter and determined that the school district is not liable in such circumstances.

In *Cornfield v. Consolidated High School District No. 230,* 991 F.2d 1316 (7th Cir. 1993), a student had been subjected to a "strip" search by school officials in his high school. In determining that the school district would not be liable for the actions of the dean (principal) even if such a search had been unconstitutional, the majority[29] first noted that because the school district had not promulgated specific guidelines to govern the searching of students, the school district would be liable only if the dean had final decisionmaking authority. *Id.* at 1324. It further noted that "identifying those vested with the authority to make policy is no mean feat," because following the Supreme Court's directive to look to state law to make this call "does little to reveal how a court evaluates the actions of a municipal employee or agent." *Id.* Indeed, as the panel noted, an individual with executive authority whose actions "fly in the face of state or local law" would not be a policymaker under *Monell* and its progeny. *Id.*

Ultimately, the panel determined that the absence of a written policy and the decision to delegate authority to individual principals to handle disciplinary matters, such as searches, does not support an inference that final policymaking authority has been delegated to a subordinate. *Id.* It cautioned that its decision should not be viewed as a perverse incentive for school districts not to adopt policies, because the custom or practice of school administrators, if tacitly acquiesced in by the board, may trigger liability. *Id.* at 1326. Absent some liability as a result of custom or practice or through the failure to promulgate a policy, however, the panel concluded

---

**28.** As noted *infra,* a governmental employer may be held liable under certain circumstances when the latter has failed to adequately train employees or where a custom in contravention of the formal policy, has developed.

**29.** Although concurring in the judgment, Judge Easterbrook did not believe that the

discussion regarding municipal liability was necessary to reach the decision in that case. 991 F.2d at 1328 (Easterbrook, J., concurring). Whether the majority's discussion of this issue was dicta or an alternative ground for its decision, this Court believes that the discussion is useful here.

that a particular decision by a principal to conduct a search, even if the search is later determined to be unreasonable, does not constitute board policy authorizing unreasonable searches. *Id.*

Indeed, the *Cornfield* decision inspires consideration of the ramifications of a ruling that a principal's decision to conduct a search constitutes official policy for which a school board may be held liable whenever a federal court later disagrees with the principal's decision. In a school district composed of many schools, the board would be potentially liable for *every* instance in which a school administrator elected to search the notebook, book bag, or locker of a student. With the potential for omnipresent liability, the school district might then be unwilling to delegate even the most elementary of such decisions to its school administrators but instead would require school district approval for every such action by the local school. That kind of oversight would further erode a principal's ability to demonstrate her authority and to make those quick decisions that are imperative for the maintenance of order and discipline. Ultimately, of course, the final micro-manager of school discipline would be the federal courts. While this has always potentially been the case since *T.L.O.,* the existence of automatic school district liability in every instance in which a search is later determined not to be accompanied by reasonable suspicion would now render these kinds of cases much more financially attractive to bring.

Of course, if *Monell* and progeny compel such a result, the above specter is obviously not a valid reason for ignoring these decisions. Courts must follow the law, no matter how unwise the results may seem to be. A discussion of these potential ramifications, however, reveals the significance of any decision holding a school board automatically liable for the daily, discretionary decisions of its administrators and encourages great caution in any attempt to decipher the rather vague phrase: "final policymaker."

In attempting to decipher that phrase, one seeks guidance from Eleventh Circuit cases that have discussed this particular theory of liability. The Court notes that the Eleventh Circuit has found no liability in employment situations where the decisionmaker's decision is not really final because it is subject to review. *See Morro v. City of Birmingham,* 117 F.3d 508, 514–15 (11th Cir.1997) (finding it doubtful that chief of police is final decisionmaker for disciplinary suspension decisions as Personnel Board of Jefferson County reviews chief's decisions); *Scala v. City of Winter Park,* 116 F.3d 1396, 1398–99 (11th Cir. 1997) (holding city manager not a final decisionmaker with respect to employment termination decisions at municipal fire department where those decisions were reviewable by the city civil service board); and *Hill v. Clifton,* 74 F.3d 1150, 1152 (11th Cir.1996) (police chief not final decisionmaker because his actions reviewed by city manager). *See also Denno v. School Bd. of Volusia County, Fla.,* 182 F.3d 780, 786–87 (11th Cir.1999) (finding that school officials not final decisionmakers for suspension of student because meaningful review of school officials' decisions provided by "Code of Student Conduct and Discipline") and *Manor Healthcare Corp. v. Lomelo,* 929 F.2d 633, 638 (11th Cir.1991) (holding mayor not final policymaker with respect to zoning decisions where city charter provided that city counsel could override the mayor's veto of zoning ordinances).

That a governmental entity is not liable whenever a decisionmaker's decision is subject to further review does not necessarily mean that liability should be triggered whenever the converse occurs: that is, when there can be no further review of the decision. While a conclusion of no municipal liability makes sense with regard to decisions that are capable of re-

view, such as employment and zoning decisions, a conclusion of liability for decisions that are by their nature not susceptible to review, such as decisions to search or arrest a person, is not necessarily a sensible result. Otherwise, every discretionary decision of the lowest line employee would constitute the act of a final policymaker if the effects of those decisions could not be completely eviscerated by a later review.

In attempting to discern how the Eleventh Circuit would analyze a decision that cannot be further reviewed because the decision, itself, is necessarily final, this Court has not found clear guidance. On the one hand, the Eleventh Circuit has issued an opinion that would seem to call for automatic municipal liability in such a situation. In *Mandel v. Doe*, 888 F.2d 783 (11th Cir.1989), the plaintiff, an individual incarcerated at a Florida road camp, injured his hip while performing work at the work camp. *Id.* at 785. The county had entered into an agreement with the health department to hire physician's assistants at the road camps who would provide medical care for the prisoners. Accordingly, plaintiff requested that the physician's assistant at the camp examine his hip to determine the extent of his injury. *Id.* The physician's assistant examined plaintiff numerous times but refused to authorize x-rays or an appointment with an orthopedic surgeon. Plaintiff's condition worsened to the point where he could not walk; however, the physician's assistant merely prescribed aspirin for the pain and continually refused plaintiff's numerous requests for x-rays. *Id.* at 786–87. After plaintiff's release from the work camp, he visited an orthopedic surgeon who determined that plaintiff had suffered a broken hip necessitating a complete hip replacement. *Id.* at 787. Plaintiff brought suit under 42 U.S.C. § 1983 against the county for deliberate indifference to his medical needs in violation of his Eighth Amendment rights. *Id.*

The panel held that the county could be liable for the acts of the physician's assistant because his actions in failing to properly diagnose plaintiff's hip fracture amounted to county policy. Indeed, the panel found that "[t]he policy was that [the physician's assistant's] medical decisions were subject to no supervision or review, except to the extent that [the physician assistant] himself, in his sole and unsupervised discretion, deemed appropriate." *Id.* at 794. Accordingly, the panel held that the physician's assistant "was the sole and final policymaker with respect to medical affairs at the road prison." *Id.*

On the other hand, when examining a governmental entity's liability for an illegal warrantless search or arrest by one of its police officers, the Eleventh Circuit appears never to have held that the particular search or arrest represented official governmental policy, even though the officer's decision would have been, by its nature, not subject to further review. *See Brown v. Neumann*, 188 F.3d 1289, 1290 (11th Cir.1999) ("it would be contrary to common sense to hold that a Deputy Sheriff's discretionary decisions in the field amount to official policy 'not subject to review.'") and *Wright v. Sheppard*, 919 F.2d 665, 674 (11th Cir.1990) (deputy lacked authority to make final policy for sheriff's department). Indeed, several courts that have addressed the police search situation have held that individual police officers cannot establish policy for their municipality. *See Carr v. Williams*, 1999 WL 550803, at *2 (9th Cir. July 28, 1999) (holding detective not final policymaker for writing and executing a deficient warrant simply because he could "obtain and execute warrants without further explicit direction from his superiors" because a municipality cannot be held liable under a respondeat superior theory of liability); *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 890 (9th Cir.1990) (finding LAPD not liable for acts

of individual officers in carrying out administrative search warrant without probable cause because no evidence that LAPD policymakers adopted policy of allowing improper searches); *Clayton v. City of Kingston*, 44 F.Supp.2d 177, 184 (N.D.N.Y. 1999) (finding city not liable under final decisionmaker theory because no evidence that police officers were acting as final decisionmakers when illegally searching plaintiff's apartment; rather, officers "merely exercised discretion under existing policy established by the police department"). *See also Pembaur*, 475 U.S. at 486, 106 S.Ct. 1292 (White, J., concurring) ("where the controlling law places limits on [the state officers'] authority, they cannot be said to have the authority to make contrary policy.")

Applying the above cases to this case, it is difficult to draw an intelligent distinction, for purposes of ascribing a policymaking moniker, between a police officer who effects a search and a school principal who takes the same action. That the principal has a title does not seem to suggest an important distinction. Presumably, the result in the above cases would not change if the searching police officer happened to be a sergeant. To label a principal, but not a police officer, a policymaker in the context of searches would necessarily subject schools to a much more exacting standard than police departments: a curious result.

Accordingly, given the analytic inconsistencies between *Mandel*[30] and the police search cases, this Court is somewhat at a loss as to what construction to give in this case. The Court does not have to reach its own final decision on this question, however, because even assuming that Roberts was a final policymaker, it concludes that her authorization of a search was too ambiguous to constitute authorization for a strip search.

Turning to Robert's putative authorization, Morgan recounted in her deposition that she encountered Roberts in the school's copy room, where Roberts was cutting papers at a cutting board.[31] (Morgan Dep. at 59.) Morgan explained that

**30.** One can attempt to draw some practical distinctions between a warrantless search and the facts in *Mandel*. In the latter, the physician's assistant's recklessness was demonstrated through egregiously and shockingly negligent decisions made over a period of time, and the county arguably should have implemented some review process by which a doctor or medical official could review such decisions. Any review process of a principal's decision to search a student would not be terribly practicable, however. Moreover, the threshold for liability in an Eighth Amendment claim—deliberate indifference to the medical needs of the prisoner—is a much higher threshold than that found in Fourth Amendment claims, which require only an after-the-fact conclusion that a search lacked a reasonable basis. As a matter of policy, one might want to insure compensation for an individual who has suffered serious and real physical injuries at the hand of an egregiously negligent prison medical officer; such injuries are typically lacking when a search lacking reasonable suspicion has been made. Moreover, county liability in the former situation would encourage the county to insure that adequate medical care be rendered to prisoners: surely, a worthwhile goal. In short, there are no negative or unintended consequences of a policy that holds the governmental entity liable in such a situation. Substantial negative consequences flow from a determination that the county is automatically liable whenever a school administrator oversteps his bounds, however, for, if that is the case, administrators will be discouraged from conducting any searches, even those necessary to insure order and discipline in the school setting, out of fear of liability.

**31.** It is clear that Morgan's deposition testimony is the testimony most favorable to plaintiffs on this issue. Roberts, testified that she did not authorize a search of the students' bodies. (Roberts Dep. at 62.) Another witness, Madricia Nettles, was in the room during the conversation between Morgan and Roberts. In her deposition, she testified that although she could not remember exactly what was said throughout the entire conversation, she remembered that, upon being informed that $26 was missing from the classroom, Roberts told Morgan that "we'll have to go through their things." (Nettles Dep. at 13.) Nettles did not recall Morgan giving any more specifics regarding the scope of the search. (*Id.* at 14.) Neither of these two wit-

she told Roberts that the money was missing and that Roberts simply told her that "it was fine to do a search" because "no child should have that kind of money on them." (*Id.* at 60.) Morgan expressly testified that Roberts gave her no guidance on how to conduct the search. (*Id.* at 60–61.) Morgan also stated that Roberts knew of Morgan's desire to enlist Billingslea's participation in the search and expressly approved his participation. (*Id.* at 60, 62.)

Taking the facts in the light most favorable to the plaintiffs, the Court concludes that Roberts did not authorize a strip search.[32] Indeed, nowhere in her words, themselves, is there any mention of a strip search. Admittedly, Roberts did not discuss the parameters of Morgan's intended search, as a prudent administrator should have done, and, were a negligence theory applicable, Roberts perhaps could be held responsible for any subsequent search taken pursuant to her very sketchy directions.[33] Nevertheless, a rule that imposes liability only when the final decisionmaker has made policy seems to this Court to require something more affirmative than a pronouncement that might, or might not, be inferred as granting authority to do a particular act. Moreover, telling a teacher that she may conduct a

search of her students does not automatically equate with telling that teacher that she may require the students to disrobe in front of each other. As noted *supra*, this Court would have approved a search that fell short of the "strip" search that occurred here. Roberts' authorization was consistent with such a lesser search. Accordingly, the Court concludes that Robert's authorization to Morgan did not constitute an express statement of policy authorizing a strip search and hence the Clayton County School District is not liable as a result of her decision as a final policymaker.

### 2. School District Liability Based on a Failure to Train

 A municipality "is not automatically liable under § 1983 even if it inadequately trained or supervised its [employees] and those [employees] violated [plaintiffs'] constitutional rights." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir.1998). "Instead, the Supreme Court has explained that there are only 'limited circumstances' in which an allegation of a failure to train or supervise can be the basis for liability under § 1983." *Id.* "The Supreme Court has instructed that these 'limited circumstances' occur only

---

nesses' accounts of the conversation support plaintiffs' contention that the authorization given to Morgan included the right to conduct a highly intrusive strip search of the children.

**32.** Plaintiffs also submit the testimony of several of the students who allegedly overheard Morgan saying that "Roberts authorized a strip search." (Pls.' Resp.Br. in Opp'n to Def. Clayton County School District's Mot. for Summ.J. [81] at 28.) Defendants object that this testimony is inadmissible hearsay that cannot be considered when considering a motion for summary judgment. *See McMillian*, 88 F.3d 1573, 1577 (11th Cir.1996), *aff'd*, 520 U.S. 781, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). The Court agrees. Although a statement from Roberts to Morgan authorizing a strip search could be admissible against Roberts or the school district as an admission by a party opponent or as an admission by an

agent concerning facts within the scope of her employment, there is no non-hearsay, admissible testimony that Roberts ever made this statement. Indeed, Morgan, whom the students purportedly overheard paraphrasing Robert's words, did not testify that Roberts ever said this. As Morgan has taken a position adverse to Roberts and as authorization by Roberts for a strip search would have helped defendant Morgan's prospects in this litigation, the Court can only conclude that the students' testimony in this regard constitutes inadmissible hearsay.

**33.** To the extent that negligence plays a role in assessing *Monell* liability, the Court concludes that such negligence factors into the custom and policy analysis or a failure to train argument, discussed *infra*.

when the municipality inadequately trains or supervises its employees, this failure to train or supervise is a [municipal] policy, and that [municipal] policy causes the employees to violate a citizen's constitutional rights." *Id.*

██ "Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, the Supreme Court has further explained that a plaintiff may prove a [municipal] policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants." *Id.* "To establish a 'deliberate or conscious choice' or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Id.* Plaintiffs may demonstrate this is one of two ways. First, "the need for more or better training may be obvious where a pattern of constitutional violations exists such that the municipality knows or should know that corrective measures are needed." *Young v. City of Augusta, Ga.,* 59 F.3d 1160, 1172 (11th Cir.1995). Plaintiff must submit evidence "of a history of widespread prior abuse" such that the school district should be "on notice of the need for improved training or supervision." *Gold,* 151 F.3d at 1351. Second, "the need for a particular type of training may be obvious where [municipal employees] face clear constitutional duties in recurrent situations" even without prior incidents to place the municipality on notice. *Young,* 59 F.3d at 1172; *see City of Canton v. Harris,* 489 U.S. 378, 390 n. 10, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) and *Board of County Comm'rs v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The Eleventh Circuit, however, has cautioned that "the Supreme Court

has given only a hypothetical example of a need to train being 'so obvious' without prior constitutional violations: the use of deadly force where firearms are provided to police officers." *Gold,* 151 F.3d at 1352 (citing *City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197).

██ Plaintiffs claim that the Clayton County School District should be liable for the alleged constitutional deprivations in this case because the school district has created a custom of allowing unguided and unconstitutional searches of students' persons. (Pls.' Br. [81] at 29.) Specifically, plaintiffs claim that the school district's custom can be implied from the school district's:

A. Fail[ure] to promulgate policies to address standards for searches of students' persons including parental consent, particularized suspicion and reasonableness of scope when such searches "obviously" occur;

B. Fail[ure] to train or supervise teachers and administrators regarding the proper standards for searches or students' persons including parental consent, particularized suspicion and reasonableness of scope when searches "obviously" occur;

C. Establish[ment] of a custom of permitting searches of students' persons in violation of proper standards for parental consent, particularized suspicion and reasonableness of scope; and

D. Hiring and retaining Morgan with a recent felony forgery charge.[34]

(*Id.* at 29–30.)

Although plaintiffs have not expressed their arguments in the fashion enunciated by the Eleventh Circuit discussed *supra,*

---

**34.** It is clear that a single hiring decision will rarely serve as the basis for municipal liabili-

ty. *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382,

the Court will address the claims made by plaintiffs in terms of the framework established by the Eleventh Circuit. In order for plaintiffs to survive summary judgment on this claim, plaintiffs must present evidence that the school district was "deliberately indifferent" to the rights of these students. To do this, plaintiffs can present evidence either (1) the district was on notice of a history of "widespread prior abuse" due to prior incidents of intrusive searches in Clayton County schools or (2) the need to train regarding searches of students' persons "was so obvious and the likelihood of constitutional violations was highly predictable so that liability attaches for this single incident." *Gold,* 151 F.3d at 1351–52. The Court will address the evidence submitted in this case concerning each method of proof.

a. *Prior Incidents of Intrusive Searches*

Plaintiffs contend that "Clayton School Districts [sic] history of unguided personal searches is well demonstrated in the record." (Pls.' Br. [81] at 37.) To support this statement, plaintiffs offer the affidavit of Katherine Lewis, an ACLU law clerk, to support their contention that prior incidents of searches should have put the school district on notice that other unconstitutional searches had occurred within the school district. In this affidavit, Lewis states that she reviewed 296 incident reports from the CCPD. (Lewis Aff. at ¶ 4.) Of the 296 reports, Lewis avers that 45 involved searches of students, 12 of the 45

involved searches that were conducted by both police and school officials, and 24 of the searches involved solely school officials. (*Id.* at ¶ 5.) Further, Lewis declares that one report involved a search of an entire group of high school students conducted by a Clayton County police officer for two lost Nintendo cartridges. (*Id.* at ¶ 7.) Another report describes an incident where a police officer frisked a student and performed a pat-down of the student's crotch area. (*Id.* at ¶ 8.) Another search involved a police officer and school administrator conducting a pat-down of a female student. (*Id.* at ¶ 10.) Finally, another report documented a pat-down search of a male student's front pocket in the middle of a school cafeteria. (*Id.* at ¶ 11.) Although Lewis' affidavit explains that these events occurred, the affidavit does not give factual detail in order to determine whether any of these searches were performed unconstitutionally and does not describe the school official's role in authorizing or conducting the searches, other than noting their presence at some of the searches.

Relying on this evidence, plaintiffs argue that "[t]he record presents a jury question on whether the lack of policies and training on searches of students [sic] persons, combined with the frequency of such unguided and unreviewed searches create a custom which this case symbolizes and reaffirms." (Pls.' Br. [81] at 38.) Plaintiffs' evidence and argument, however, fall far short of the requirements of a "widespread prior abuse" sufficient to establish that Clayton County School District's ap-

1391, 137 L.Ed.2d 626, (1997). This is especially true in this case, where plaintiffs claim that the hiring of Morgan with a recent arrest for forgery should subject the school district to liability. For liability to accrue, the hiring of Morgan must have been the "moving force" behind that constitutional violation; that is, the fact that Morgan was hired with a felony arrest must have caused the unconstitutional searches. *Id.* Simply because one has a forgery arrest does not lead to the inexorable conclusion that that individual is

more likely to engage in an unconstitutional strip search. Moreover, the Supreme Court has cautioned that a single hiring decision, without evidence that the decision displays a high risk that the employee will violate the Constitution in performing his or her duties, will not subject the municipality to liability. *Id.* at 1394. In this case, plaintiffs have not shown that Morgan posed a "high risk" of committing constitutionally impermissible searches solely due to her arrest in connection with a forgery charge.

parent failure to train, supervise, or implement policy evidenced a "deliberate indifference" to the rights of its citizens.

In *Brooks v. Scheib*, 813 F.2d 1191 (11th Cir.1987), a panel of the Eleventh Circuit held that ten complaints against a particular officer did not amount to the requisite notice necessary to confer municipal liability. Critically, the panel determined that the plaintiff "never demonstrated that past complaints of police misconduct had any merit." *Id.* at 1193. The Court found that "the number of complaints bears no relation to their validity." *Id.* *See also Gold*, 151 F.3d at 1351.

In the instant case, plaintiffs have failed to demonstrate that any other unconstitutional search occurred in the schools controlled by the Clayton County School District. Lewis' affidavit, while noting that other searches of students had occurred over the last several years, did not describe any one search that was performed in violation of the Constitution. Plaintiff must not only show that searches of students had occurred in the past, but also demonstrate that those searches violated the Constitution. *Compare Gold*, 151 F.3d at 1351 (plaintiff failed to present evidence of prior constitutional violations) *with Rivas v. Freeman*, 940 F.2d 1491, 1495–96 (11th Cir.1991) (plaintiff presented evidence that sheriff knew of prior instances of mistaken identity but failed to take action).

Moreover, the other documents submitted by plaintiffs to support this claim also lack the requisite specificity to demonstrate that the school district was on notice of prior unconstitutional searches. Although the first document lists "allegations of physical force by a teacher against a student," this document does not address the nature of the touching nor does it indicate the resolution of any investigation of the incident. The second document details an incident of a teacher pulling down

pants of three students and spanking them, but this incident occurred after the searches of the students at issue in the instant case. As such, this incident could not have put the school district on notice of a need to train and supervise regarding searches. Moreover, the document submitted by plaintiffs does not reveal the outcome of any investigation of the incident.

Accordingly, the Court finds that plaintiffs' evidence of prior instances of unconstitutional searches is insufficient as a matter of law to show that the Clayton County School District was on notice of the need to train or supervise in this area. As such, defendant Clayton County School District cannot be held liable under this theory of municipal liability, regardless of the adequacy of the training and supervision given to county employees regarding searches of students.

### b. "Obviousness" of Need to Train and Supervise

Plaintiffs contend that evidence of prior incidents is not required to establish a municipal policy because the need to train and supervise was so obvious and the likelihood of constitutional violation so highly predictable that liability should attach for the single incident. To support this contention, plaintiffs again offer the Lewis affidavit to show that searches of students occurred rather frequently. Moreover, plaintiffs show that nine other school districts in the area have policies specifically addressing the searches of students' persons. (Pls.' Br. [81] at 32 n. 18; Pls.' School Exs. [84] at Ex. 106.) Finally, plaintiffs contend that "[w]ith the unfortunate reality of drugs, stealing, and violence in schools ...; school officials 'obviously' will be placed in the position to search students' persons." (*Id.* at 36.)

In *City of Canton*, "the Supreme Court, in dictum, left open the possibility that a

need to train could be 'so obvious,' resulting in a [municipality]'s being liable without a pattern of prior constitutional violations." *Gold,* 151 F.3d at 1352 (citing *City of Canton,* 489 U.S. at 390, 109 S.Ct. 1197). Subsequently in *Brown,* "the Supreme Court characterized the City of Canton's leaving open the possibility as simply hypothesizing in a narrow range of circumstances that a plaintiff might succeed without showing a pattern of constitutional violations." *Id.* (citing *Brown,* 117 S.Ct. at 1391.) A panel of the Eleventh Circuit has recently cautioned, "In short, to date, the Supreme Court has given only a hypothetical example of a need to train being 'so obvious' without prior constitutional violations: the use of deadly force where firearms are provided to police officers." *Id.* (citing *City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197).

Plaintiffs must show that the need for training on searches and seizures is "obvious in the abstract." *Gold,* 151 F.3d at 1352 (citing *Brown,* 117 S.Ct. at 1391.) To do this, plaintiffs may demonstrate that "the need for a particular type of training may be obvious where [employees] face clear constitutional duties in recurrent situations." *Young,* 59 F.3d at 1172. Although plaintiffs have shown that school officials may engage in searches pursuant to the guidelines established by the Supreme Court in *T.L O.* and that some types of searches have occurred in Clayton County schools in the past, plaintiffs have not provided sufficient evidence that teachers and administrators in Clayton County are faced with recurrent search situations akin to the searches that occurred in this case, such that the need to train is plainly obvious.

A comparison to the Supreme Court's hypothetical in *City of Canton* is helpful. In that case, the Court noted,

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*City of Canton,* 489 U.S. at 390 n. 10, 109 S.Ct. 1197. In contrast to the police officer who every day carries his gun and must decide how to apprehend criminals, as the primary focus of his job, school districts do not know "to a moral certainty" that teachers and administrators will regularly engage in searches of students' persons in the classroom.

Moreover, without a concrete example from the Eleventh Circuit or the Supreme Court, this Court is not prepared to declare that the need to train on issues of search and seizure law is so plainly obvious as to render the Clayton County School District liable for the alleged failure to do so in this case.[35] Accordingly, defendant Clayton County School District is entitled

---

35. It is not accurate to say that Clayton County failed to instruct its administrators regarding search and seizure law. Dr. Bob Dolph, a school administrator, spoke to school district administrators regarding the "reasonable suspicion standard" governing school searches. (Def.'s Mot. for Summ.J. [65] at 16, Dolph Aff. at ¶ 4.) The Clayton County School District, however, admits in its reply brief that "[i]t is true that the School District provided no particular training specifically directed to the concept of individualized suspicion." (Def.'s Reply Br. [88] at 14.)

Further, the school district submitted the affidavits of Jack Warren, Administrative Assistant to the Superintendent of the Clayton County School District, and Deborah Bass, Elementary Coordinator of the Clayton County School District, who both aver that the county regularly distributes to elementary students, their parents, administrators, and teachers, the Clayton County Public School Elementary Handbook for Parents and Students. (*Id.* at Warren Aff. at ¶ 3 and Bass Aff. at ¶ 3.) This handbook contains the following: "school administrators, or their designated

to summary judgment on plaintiff's failure to train and supervise claim.

### 3. Municipal Liability Based on Ratification

Plaintiffs also argue that the Clayton County School District ratified the unconstitutional searches of the students through a cursory investigation following which the district took virtually no corrective action. (Pls.' Br. [81] at 39–40.) Plaintiffs argue that this failure to investigate is tantamount to ratification of the searches thereby imposing liability on the municipality. (*Id.*)

Plaintiffs base this theory on language from the Supreme Court's decision in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). In *Praprotnik*, a plurality of the Supreme Court held that municipal policy may be created by a policymaker's ratification of a subordinate's actions. *See Praprotnik*, 485 U.S. at 127, 108 S.Ct. 915. The Court further explained, however, that the creation of policy by a subordinate does not occur simply because a supervisor goes along with the discretionary decisions of his or her subordinate. *Id.* at 130, 108 S.Ct. 915. Rather, in order for a subordinate's actions to be deemed municipal policy, one of two things must occur: either the subordinate must cast his discretionary decision in the form of a policy statement that is then expressly approved of by the supervising policymaker or the subordinate must have repeatedly made the same decision such that it had become a "custom or usage" of which his or her supervisor must have known and approved. *Id.See also Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 998 n. 29 (11th Cir.1990).

Plaintiffs' reliance on *Praprotnik* is misplaced. This case stands for the proposition that a non-final policymaker's decision may serve the basis for municipal liability if the actual policymaker approves the decision and the basis for it.[36] In the instant case, the searches were concluded, and no after-the-fact approval or disapproval could change the fact that the searches had already occurred. Even if the school district had strongly admonished Morgan and Roberts for their roles in the search, the constitutional violation would not have been altered.

The only other avenue available to plaintiffs to impose liability on the municipality for failing to investigate would be to show that the failure to investigate is so prevalent as to amount to a county policy. Plaintiffs have not offered any proof that the failure to investigate claims or failure to take disciplinary action against employees within the Clayton County School District amounts to a policy. *See Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir.1985) ("a *persistent failure* to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of *Monell*") (emphasis added). Accordingly, defendant Clayton County School District is entitled to summary judgment as to this issue.

---

representatives, possess the authority to conduct a reasonable search of students and their possessions when on school property. The administrator is required to have only reasonable suspicion to conduct such searches." (*Id.* at Bass and Warren Affs. at Ex. 1.)

**36.** This theory would more likely be applicable in a situation where a plaintiff was fired by a municipality. In such a situation, there is typically a decision made by a municipal employee who is not the final decisionmaker because his firing decisions are generally reviewable by a civil service board. In such an instance, although the original decision to fire by the plaintiff's supervisor is not the final decision on the matter, the subsequent approval by a review board would serve as the final decision chargeable to the municipality. This appears to be the type of situation contemplated by the Supreme Court in *Praprotnik*.

### C. Municipal Liability Claims Against the Clayton County Police Department

 Plaintiffs argue that Clayton County should be liable for Officer Billingslea's unconstitutional search of the boys.[37] First, plaintiffs contend that Clayton County failed to institute a policy "dealing with the authority of DARE officers to conduct strip search[es]" and failed to train its DARE officers "on the proper standards and procedures for conducting strip searches in schools." (Pls.' Br. [82] at 27.) Second, plaintiffs claim that "Clayton County's failure to develop a comprehensive system to review Internal Affairs unit complaints amounts to a deliberate indifference to its responsibility to supervise its employees." (Id. at 33.)

#### 1. Failure to Train with Regard to Student Searches

As discussed supra, in order to prove that the county is liable for a failure to train or supervise, plaintiffs must show that Clayton County was "deliberately indifferent" to the rights of the students in this case. Plaintiffs may do this by presenting evidence that (1) the district was on notice of a history of "widespread prior abuse" due to prior incidents of intrusive searches performed by officers in schools or (2) the need to train and supervise regarding police searches of students' persons "was so obvious and the likelihood of constitutional violations was highly predictable so that liability attaches for this single incident." Gold, 151 F.3d at 1351–52.

Plaintiffs' only proffered evidence of widespread prior unconstitutional searches performed by officers in Clayton County schools comes through the affidavit submitted by Katherine Lewis. As discussed supra, although Lewis' affidavit explains that these events occurred, the affidavit does not support an inference that these searches were unconstitutional nor does it describe the police officers' role in these searches, other than to note the officers' presence. To satisfy their burden of showing that Clayton County evidenced a "deliberate indifference" to the rights of students, plaintiffs must show not only that searches of students had occurred in the past but also that those searches violated the Constitution. Compare Gold, 151 F.3d at 1351 (plaintiff failed to present evidence of prior constitutional violations) with Rivas v. Freeman, 940 F.2d 1491, 1495–96 (11th Cir.1991) (plaintiff presented evidence that sheriff knew of prior instances of mistaken identity but failed to take action). Because plaintiffs have offered no evidence to support their contention that officers conducted unconstitutional searches in the past, plaintiffs cannot prevail under this method of proving that Clayton County was deliberately indifferent to the rights of students. See also Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir.1990) (recognizing no liability where district court "found no evidence of a history of widespread prior abuse by Department personnel that would have put the sheriff on notice of the need for improved training or supervision").

Plaintiffs also contend that it should have been obvious to Clayton County that the DARE officers needed to have training regarding school searches of students. In support of this contention, plaintiffs once again rely on Katherine Lewis' affidavit to

---

**37.** Clayton County has moved for summary judgment as to any claims that they are liable for the strip searches of the girls. The county notes that plaintiffs do not allege in their amended complaint that Billingslea participated in any searches of the girls' persons. Accordingly, as plaintiff can present no evidence that Billingslea participated in the search of the female students in this case, liability cannot flow to the municipality for the allegedly unconstitutional searches of the girls. Hence, the Court grants summary judgment to Clayton County as to any claim made by the female students who were searched.

show the frequency in which searches of students occurred in Clayton County. Additionally, plaintiffs argue that because DARE officers would have daily interaction with students, it was obvious that they would be involved in searches of students. (Pls.' Br. [82] at 31.) Thus, plaintiffs claim that the failure to train officers regarding the search of students, in light of the obviousness of the need to train, is sufficient to create an inference that Clayton County was deliberately indifferent to the rights of the students.

At the outset, the Court notes that it is undisputed that Clayton County officers receive training concerning searches and seizures and that Officer Billingslea, himself, received training in 1988, 1992, and 1994. Plaintiffs' complaint is that these officers do not receive special training regarding the proper scope of the search of a student. First, the Court notes that, unlike the hypothetical offered in *City of Canton*, Clayton County does not know to "a moral certainty" that DARE officers will conduct searches of students in the schools. Indeed, plaintiffs have been unable to cite the Court to one other instance in which a DARE officer conducted a search of a student in a Clayton County school: an unsurprising result given the fact that DARE officers are specifically instructed not to act in an enforcement capacity unless a clear emergency exists. Moreover, as officers receive training on searches, generally, plaintiffs have not demonstrated what additional training they envision on the concept of an "emergency." Further, as the officers receive training on the heightened probable cause

standard for searches, plaintiffs have not demonstrated how training regarding the lower level of suspicion necessary for a search of students would have caused an officer to be more reticent in conducting such searches.[38] Accordingly, as plaintiffs are unable to show that Clayton County was deliberately indifferent in its alleged failure to train and supervise regarding student searches, the Court **GRANTS** defendant Clayton County's motion for summary judgment as to this issue.

2. *Failure to Institute Procedures to Address Internal Affairs Complaints and Failure to Investigate and Discipline Billingslea*

Next, plaintiffs contend that Clayton County failed to develop a comprehensive system to review internal affairs unit complaints. Specifically, plaintiffs argue that Clayton County does not log[39] into internal affairs each complaint made against a particular officer and that it does not investigate all complaints. (Pls.' Br. [82] at 33–34.) Plaintiffs contend that had the internal affairs investigation system worked properly, Officer Billingslea's past misconduct would have been monitored and his misconduct would not have continued unchecked. (*Id.* at 35.)

Although, as discussed *supra*, a municipality may be held liable for the "persistent failure to take disciplinary action against officers," plaintiffs have failed to make a showing that such a persistent failure exists in the Clayton County Police Department.[40] *See Fundiller*, 777 F.2d at 1443. Although discussing in vague terms the inadequacy of the procedures for in-

---

**38.** That said, holding that, as a constitutional matter, Clayton County was not required to offer more training in the area of school searches does not mean that such training might not be a prudent idea for officers who will regularly be in the school system.

**39.** Curiously, plaintiffs have submitted thirteen internal affairs written complaints regarding Officer Billingslea, despite their contention that these types of complaints are not

tracked according to the officer against whom the complaint is lodged.

**40.** Such a failure to institute a proper system to investigate citizen complaints and discipline officers was found to have been "deliberately indifferent" to the constitutional rights of citizens in *Vineyard v. County of Murray, Georgia*, 990 F.2d 1207 (11th Cir.1993). *Vineyard* is distinguishable, however, because

vestigating complaints lodged against officers, plaintiffs cannot show that such a failure has caused a breakdown in the discipline system for Clayton County such that police officers regularly conduct unconstitutional searches. Indeed, plaintiffs do not attempt to show that any other unconstitutional searches went unpunished by the CCPD.

Moreover, as defendants correctly point out, even if the failure to institute a system of complaints did amount to "deliberate indifference" sufficient to trigger municipal liability, plaintiff is unable to show that the failure to investigate complaints caused the constitutional violation in this case. Assuming that a municipality has knowledge of the need to implement a better system to address citizen complaints and to discipline officers, a plaintiff seeking to prevail on this claim must demonstrate an affirmative link between the failure to train and the resulting constitutional deprivation. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). This affirmative causal link between a failure to act and a resulting constitutional violation requires strict evidentiary proof. The Fourth Circuit explained:

> This requires first that a specific deficiency rather than general laxness or ineffectiveness in training be shown. It then requires that the deficiency or deficiencies be such, given the manifest exigencies of police work, as to make occurrence of the specific violation a reasonable probability rather than a mere possibility. In common parlance,

the specific deficiency or deficiencies must be such as to make the specific violation "almost bound to happen, sooner or later," rather than merely "likely to happen in the long run."

*Spell v. McDaniel,* 824 F.2d 1380, 1390 (4th Cir.1987) (citing *Patzner v. Burkett,* 779 F.2d 1363, 1367 (8th Cir.1985)); *see also Floyd v. Waiters,* 831 F.Supp. 867, 873 (M.D.Ga.1993), *aff'd,* 133 F.3d 786 (11th Cir.1998) (quoting *Spell,* 824 F.2d at 1390).

Turning to Officer Billingslea and the particular constitutional deprivation alleged in this case, plaintiffs have failed to demonstrate the requisite causal connection between the improper supervision of Billingslea and the particular searches that occurred in this case. Although Officer Billingslea had thirteen complaints lodged against him in an eight year career, many of these complaints were unfounded. (Jewett Dep. at 89.) Moreover, these complaints did not involve the searches of individuals based on less than the requisite suspicion. Thus, plaintiff has not shown that any complaints lodged against Billingslea were similar to the incident at the heart of this case.[41] Accordingly, any failure to investigate complaints properly could not have been the "moving force" behind the constitutional violations alleged in the instant case.[42] *See Board of County Comm'rs v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997).

### III. *Plaintiffs' State Law Claims*

■■■ Because all the claims over which the Court had original jurisdiction now

---

unlike the police force in *Vineyard,* Clayton County has internal investigation policies. Second, unlike the clearly deficient investigation in Vineyard, Clayton County did investigate and discipline Officer Billingslea for his actions in performing these searches. This discipline included a written reprimand from the Chief of Police and a lower than average raise after his 1996–97 annual review. Further, unlike in *Vineyard,* plaintiff here has offered no evidence, other than the conclusory statements regarding causation, that the alleged failure of the internal affairs system

was the "moving force" behind the constitutional violations in this case.

**41.** Clayton County persuasively argues that "[i]t is unreasonable to claim Billingslea's propensity for writing traffic tickets would inexorably lead the county to conclude that he would strip search elementary school searches." (Def. Clayton County's Reply Br. [85] at 9.)

**42.** Much like the hiring and retention of Morgan by the Clayton County School District,

have been removed from the case due to the Court's decision to grant defendants' motions for summary judgment with respect to plaintiffs' federal claims, § 1367(c)(3) applies.[43] As the Supreme Court has observed, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendant state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988) (footnote omitted). *See also Hardy v. Birmingham Bd. Of Educ.,* 954 F.2d 1546, 1550 (11th Cir.1992).

The Court concludes that dismissal is appropriate in this case, because plaintiffs' federal claims have been dismissed. Moreover, "[n]eedless decision of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-

footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Accordingly, the Court **DISMISSES** plaintiffs' remaining state law claims without prejudice.

## CONCLUSION

For the foregoing reasons, defendant Tracey Morgan's Motion for Summary Judgment [61] is **GRANTED,** defendant R.G. Roberts' Motion for Summary Judgment [62] is **GRANTED,** defendant Ralph Matthews' Motion for Summary Judgment [63] is **GRANTED,** defendant Clayton County School District's Motion for Summary Judgment [65] is **GRANTED,** defendant Zannie Billingslea's Motion for Summary Judgment [68] is **GRANTED,** defendant Clayton County's Motion for Summary Judgment [72] is **GRANTED,** and defendant Tracey Morgan's Motion to Seal a Page of her Motion for Summary Judgment [84–A] is **GRANTED.**[44]

The Clerk is **DIRECTED** to close this action.

the hiring of Billingslea with a prior shoplifting arrest cannot form the basis of municipal liability. It is clear that a single hiring decision will rarely serve as the basis for municipal liability. *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1391, 137 L.Ed.2d 626 (1997). For liability to accrue, the hiring of Billingslea must be the "moving force" behind that constitutional violation; that is, the fact that Billingslea was hired with a felony arrest must be the cause of the unconstitutional searches. *Id.* Simply because one has a shoplifting arrest does not lead to the inexorable conclusion that that individual is more likely to engage in an unconstitutional strip search. Moreover, the Supreme Court has cautioned that a single hiring decision, without evidence that the decision displays a high risk that the employee will violate the constitution in per-

forming his or her duties, will not subject the municipality to liability. *Id.* at 1394.

**43.** This section provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

**44.** Plaintiffs' complaint seeks injunctive relief. Whether plaintiffs still seek such relief, or whether such relief is warranted, given the Court's resolution of the above issues, is uncertain. If plaintiffs still seek injunctive relief, they may file a motion and brief to that effect within thirty (30) days of this Order. Defendants may respond thereafter. The case will be reopened if injunctive relief is warranted.